## LOS ANGELES GAS & ELECTRIC CORPORATION v. RAILROAD COMMISSION OF CALIFORNIA et al. (CITY OF LOS ANGELES, Intervener).

### No. S–105.

District Court, S. D. California, Central Division.

April 8, 1932.

Herman Phleger, of San Francisco, Cal., and Paul Overton, of Los Angeles, Cal., for plaintiff.

Arthur T. George, Ira H. Rowell, and Roderick B. Cassidy, all of San Francisco, Cal., for defendants.

Erwin P. Werner, City Atty., and Frederick Von Schrader, Asst. City Atty., both of Los Angeles, Cal., for intervener.

Before statutory court composed of WILBUR, Circuit Judge, and JAMES and JACOBS, District Judges.

JAMES, District Judge.

The plaintiff brought this suit claiming the right to have an injunction against the defendant railroad commission of the State of California, and its members, to prevent the enforcement of an order of that commission fixing a schedule of rates to be charged for gas service furnished by the plaintiff. There was a motion for a temporary injunction, and, after preliminary oral argument, briefs were provided to be filed. Affidavits were received in evidence on the motion, and the commission submitted also a transcript of all of the testimony presented before it on the rate hearing, which was received without objection. A restraining order issued under adequate bond pending decision. It was understood that the issues might be further argued orally before the court after the filing of briefs, but the parties later agreed that oral argument should be waived, and that the entire case be finally submitted on the record. The court now approves that stipulation.

The California railroad commission has general jurisdiction over public utilities in California. It fixes rates for the service given the public, and its authority to act as a regulatory body within the state is exclusive. In the latter part of the year 1929 it determined that a hearing should be held with the purpose of putting into effect a decreased schedule of rates to govern the gas service of the plaintiff. The questions are the usual ones occurring in such cases, the company complaining of the use of a rate base below the fair value of its property and the commission insisting that it has given full and fair consideration to every element of worth entitled to be included in the total. The company makes the further claim that, assuming the correctness of the base figure, the return allowed is grossly inadequate.

While the plaintiff company is engaged in furnishing both electricity for light and power, and gas for domestic and industrial uses, its departments, both as to investment and operative instrumentalities, are separate and separable. They have been so divided by the commission for rate-making purposes since a date more than twelve years past. Involved in the proceeding before the commission was the matter of proper charges to be made by the company for electricity, but the rates existing were not changed. They had last previously been reduced at the request of the company in order to meet competitive rates established for service furnished by the city of Los Angeles. Therefore, there is nothing here presented which in any way involves the adequacy of charges for electricity.

The commission established two valuation totals as for the gas department of plaintiff, one which is characterized the "historical cost," and, the second, "present fair value." These totals were: Historical cost, $60,704,000; fair value, $65,500,000. On these valuations, the company would earn a net annual return of 7.7 per cent. on the first amount, and 7 per cent. on the second amount. The company claimed a fair value total of $95,767,351.

At a prior hearing had in the year 1928, the commission had fixed a schedule of rates, which estimated upon the base then used, would produce a return of 7.5 per cent. The commission determined at the hearing at which the rates now complained of were fixed that the company was actually earning under the then existing rates an excess over

the estimate, to wit, that it was earning 9.6 per cent. on historical cost base, and 8.8 per cent. on fair value base. The commission stated in its opinion that experience had shown that the actual earnings under preceding schedules fixed by it exceeded its estimates. At the hearing before the commission, it was shown that there was a difference of only $300,000 between the historical cost valuation of the commission, and that of the company. This excluded overheads. The commission in its opinion declares, and the fact appears not to be disputed, that the historical cost valuation adopted by the commission in 1917 (referred to as appraisal of 1915) was accepted as correct by both the company and the commission in the series of rate hearings held during the subsequent years. In the proceeding eventuating in the order here complained of, the commission took the 1917 rate base and built up on that to accumulate its final figures of historical cost. How the final figures were arrived at will be more particularly stated hereinafter. The change in the schedule of rates was designed to work a reduction of 9 per cent. in the gross income of the company.

In considering the claim of the company for a rate base exceeding $95,000,000, against the commission's fair value base of $65,-000,000, the point is suggested that, if the large total which the company claims represents reasonable fair value, then the old rates with which the company was satisfied to work would be patently confiscation. This reflection is of no force to influence the decision to be made, except as indicating that the company has not been over modest in proposing its totals.

Admittedly the task of rate-making is one to be essayed only by specialists, men whose research into the problems of business economy, with all of its variants of money cost, depreciation, and commercial outlook, has given them peculiar qualifications for the work. Rate cases, when they are brought into court, come impressed with the presumption that the state agency to which has been committed the duty to regulate public utilities has dealt fairly with the business affected, and that in every matter wherein, under any view, a discretion can be said to have been fairly and reasonably exercised, the courts will not interfere with the orders made. A careful study of the record has been a task entailing considerable labor, but the conclusions resulting need not, in the statement of them, be of proportionate length. It has not been thought of helpful use to analyze in any detail the great mass of evidence, nor to particularly refer to the authorities cited in the elaborate argument presented.

It appears from the record that, in the proceeding which culminated in the rate order complained of, the California commission made a most thorough investigation. It devoted a total period of twenty-four days to the taking of testimony, the hearing being completed in July, 1930. The rate order was signed November 24, 1930. Expert witnesses on both sides were heard, and the commission had recourse to its records of other rate proceedings affecting the plaintiff corporation. It availed itself also of the knowledge gained from experience in dealing over a period of many years with like utilities. In its gas service department, operated within the city of Los Angeles, the plaintiff is confronted with no real competition.

Referring to the growth and stable position of the company on its entire business (gas and electric), the commission, in its opinion, said (and the evidence supported the statement): "The rate base for the gas department has grown from approximately $12,500,000 in 1916 to nearly $59,000,000 in 1929, and its independent active meters from 131,500 during the same period. * * * This remarkable growth has been financed largely by the sale of the company's bonds and preferred stock. These have been marketed at a gradually lessening cost, so that the present annual cost of its bond and preferred stock money normally is 6.17 per cent. Also, its depreciation reserve has been invested in the property. If this be included with its bond, preferred stock money at the rate of 6 per cent. being the rate at which it is required to account for its reserve, the annual cost of its bond, preferred stock and reserve money is but 6.14 per cent. On December 31, 1929, the Company had outstanding in the hands of the public $47,070,000. par value of bonds, $19,469,995 par value of preferred stock, and $20,000,000 par value of common stock. Its depreciation reserve (gas and electric) on that date was reported at $16,804,105.15. All of its common stock is owned by Pacific Lighting Corporation. Since 1916 but $4,500,000 of this stock has been purchased for cash, $5,500,000 however, having been distributed to Pacific Lighting Corporation in the form of stock dividends, representing earnings left in the property. Dividends have been paid on its common stock of 7.20 per cent per share ($100 par value) in 1916, 1917 and 1918;

7.4 percent in 1919; 8.4 percent in 1920, 1921 and 1922; 8.7 percent in 1923; 33.75 percent in 1924, included in which is 25 percent as a stock dividend of $2,500,000; 9 percent in 1925; 9.815 percent in 1926; 35.17 percent in 1927, which includes a stock dividend of 21.42 percent, or $3,000,000; 15 percent in 1928, and 17 percent in 1929. The Company's surplus has grown from $381,212.97 in 1916 to $4,176,663.09 in 1929, while its depreciation reserve increased from $3,804,383.36 to, as said above $16,804,105.15."

Approximately 60 per cent. of the stock and bond money is chargeable to the gas department. Of the outstanding $20,000,000 in common stock, $9,993,000 was reported as having been issued for property, and $10,700,000. as for cash, or, in lieu thereof, at par. The commission was unable to give a cash value to the stock issued for property, and held that the rate of dividends on the common stock did not establish cost of common stock money. The company had claimed a cost rate of 8.5 per cent. on its common stock. The commission's evidence was that were this rate applied to common stock as insisted, the annual cost of the company's capital proceeds would be 6.62 per cent. Commenting on its findings that the annual cost of the company for its bond and preferred stock money was 6.17 per cent., the commission said: "However, just as the assumption that the Company's property was constructed at prices now current increases the actual cost figure, so a similar assumption that the Company was financed on the bases of current money cost would reduce the figure of 6.17 per cent. to 5.64 per cent."

If the experience of the company under regulation has been, as the commission finds, that returns have exceeded estimates, then it may well be that its net will be greater than the per cent. allowed under the last rate schedule. With a history of successful and profitable business, and no real competition to meet in its field of service, the hazard is small and the probabilities of continued demand assured. Electricity has not to any great extent supplanted gas as a fuel. All of the conditions noted, as affecting the business of the company, sustain the commission in its statement that the plaintiff's securities are capable of being marketed at moderate interest rates, and that it will continue to grow.

The company produced two witnesses having familiarity with financial investment conditions, who testified that, risks and uncertainties of the business considered, the company should earn more than 8 per cent.

on the fair value of its property. The commission was correct in saying that it was not to be controlled by this testimony in the face of facts before it. It cannot be said that, assuming the reasonableness of the base amount used, the rates prescribed would not produce a fair return.

The company claimed the historical cost of its property to be approximately $5,000,000 more than the amount fixed by the commission. It claimed the right to charge 24.27 per cent. to capital account as representing overheads from 1913 to 1929, which the commission disallowed in large part. It claimed a "going concern" value of $9,228,667, which was rejected by the commission, as were items designated as cost of financing, $5,921,470; promoters' remuneration, $2,500,000. The company on its physical operative property, excluding overheads, land, and intangibles, estimated historical cost as $51,661,374; and cost of same, applying unit prices as of December 31, 1929, as $57,871,271. The above were the large items expressing the disagreement as to valuation between the company and the commission.

The commission included in the historical value base as for franchise value an amount of $14,391.23; and, as original cost of organization (derived from records of the company) $415,734.71. Lands were included as of fair value of $3,500,000 as of December 31, 1929, which was approximately $1,775,588 in excess of original cost.

The commission was very liberal in its treatment of certain items of property. The company in its early operations furnished artificial gas. Since 1924 it has served natural gas, which is plentiful in the numerous oil fields in Southern California. There is no evidence which discredits the commission's conclusion that the supply of natural gas will be abundant and constant. The commission found in effect that at least two of the artificial gas manufacturing plants of plaintiff were no longer needed and might well be retired. Nevertheless, it included them in its valuation as a live necessary part of the operative property. It appears that, had these plants been eliminated, the fair value base would have been reduced by approximately $3,000,000.

In explaining the method by which it reached the valuation totals, the commission referred to testimony of its engineers. These were men of apparently wide experience in the work assigned to them. Witness Dufor testified (we refer both to commission's record and affidavit here) that as an engineer,

having a duty to place valuations upon property of interstate railroads, he was employed from 1915 to 1921 by the Interstate Commerce Commission. He had served with the California commission since March, 1921. He testified that the valuation division of the commission under his charge maintained a cost bureau which was used continuously for the collection of information regarding material and labor costs, and in making analyses of actual purchases by representative public utility corporations within the state, and also securing quotations from vendors. He testified that the trend of material and labor costs was downward; that the unemployment situation made available an unusual number of men suitable and capable to perform such work as was required by the plaintiff company. The method employed to obtain present costs as of June 15, 1930, was to take the 1915 appraisement as used by the commission at the 1917 hearing, and add thereto the cost of all articles and property included in additions and betterments, as those items were particularly shown on the books of the company, and then convert such cost prices to ruling price levels as of June 15, 1930. He made a comparative analysis by applying prices prevailing December 15, 1930; and another comparison, under which he assumed a four year construction period from January 1, 1926, to December 31, 1929, applying average prices prevailing during that time. Under each of these estimates, the total valuation figure arrived at was less than the proportionate fair value base which the commission adopted. In the estimate which assumed a four-year construction period with average prices, the engineer included overhead charges of 22.32 per cent. On his preceding estimates, his overhead charges were computed at 6 per cent.

The engineer, in his affidavit, declared, and his statement corresponds to the declaration of the commission as found in its opinion, that "current price level cost represents the cost of the properties as they existed on December 31, 1929, assuming that the properties were put together historically, but that during the entire life and development of the properties, prices and unit costs had been continuously at the level prevailing on June 15, 1930."

What the commission did then in reaching its base rate figure of fair value was to include all items of property used and useful in the operative plant of the plaintiff, and appraise the value thereof at current market prices. It included original organization costs and franchise values as well. It assumed a live active plant, and affirmed that the ultimate total included all costs of attaching business as the same had accrued and been accounted for. Its fair value figure, assuming the correct estimate and allocation of items hereinafter referred to, was one which essentially represented the investment cost, at the present time, of all the operative property and its connected incidentals. The commission used the books of the company, which furnished it with the details and items in complete form. Other engineers who testified as to valuation figures declared under oath that they were familiar with the properties of the plaintiff and had made a thorough and exhaustive study of all the matters as to which they gave information, and upon which the commission based its order. An examination of the voluminous record, including the innumerable tabulations showing the various comparisons made, demonstrates that there was no lack of attention to every element and item which would assist the commission in arriving at what it deemed to be a fair value figure.

■■ Leaving out of view for the moment the matter of overhead charges, we feel satisfied that the commission was justified in making use of the cost appraisal amount fixed in its order made in the year 1917. This amount was arrived at after an exhaustive investigation. The books of the company were determined to have been accurately kept, and different items of property were completely segregated so that additions and betterments costs were easily ascertained. Where a utility company in rate proceedings adopts, as correct, an amount fixed in an initial order made at the time it came under regulation, it ought not to be permitted to assail that amount at this time on the ground that it is inaccurate.

■ The matter of overhead charges has a somewhat different aspect. The commission's allowance of 6.35 per cent. for overheads was due in part to the position in which the company had voluntarily placed itself. In the hearing which resulted in the first order made affecting the company's rates, the company was advised that a larger amount of overhead might be charged to capital than it had customarily charged on its books to that account theretofore. These overheads occurred by reason of expenditures for engineering, superintendence, interest and taxes during construction, injuries and damages, legal services, etc. The company might, in its operative department, make use

of the same organized agencies as were used also in the construction of extensions and additions to its plant and operative facilities. Operative expense generally incurred in rendering the service was chargeable to expense, and hence would be a deductible item from gross income, while overheads incurred for extensions, betterments, and additions would augment capital account. The commission had adopted rules under which such segregation was to be made. The company proceeded, however, through all the years from 1913, to charge to capital account overhead costs amounting to less than an average of 6 per cent. In the last proceeding, that here reviewed, the company sought to reform its accounts and charge an overhead of 24.27 per cent. The commission, in referring to that matter in its opinion, said: "In the initial case involving the gas rates of this Company a rate base was fixed including overhead charges substantially higher than those charged by the Company in preceding years and approximating those now claimed. The Company was thus fully apprised of a basis of assigning to capital certain general charges allocatable in part to capital and in part to operation. Notwithstanding the fact that it was thus definitely advised of the propriety of allocating more of these to capital and less to operation, the Company, in subsequently making these splits or allocations, saw fit to allocate on its books the bulk of these to operation much as it had done prior to 1917. Under the uniform system of accounts a considerable range of discretion in making allocations such as here involved rests with the Company. Either the responsible accounting officers of the Company made these allocations in the exercise of their best judgment at the time when all of the facts were fresh in their minds or, for reasons presumably to the advantage of the Company, deliberately undercharged capital and overcharged operation. In the various proceedings before the Commission it reported additions and betterments, as well as operating expenses, based upon its books and the allocations there recorded. The findings of the Commission indicate that determinations as to rates went on the assumption that such allocations were properly made."

It is true that one of the valuation engineers for the commission testified that the company might properly have charged to capital 11.25 per cent. on account of overheads. Nevertheless, the action of the commission in this regard, we think, was reasonable. The fact was that the company, declining to follow the suggestion of the commission that it assign to capital a greater amount of overhead expenditures, charged all of such expenditures exceeding approximately 6 per cent. of the total thereof to operative expense, with the result that it has had during successive years the benefit of a much reduced net income figure, by the use of which, in turn, its rate charges have been increased.

From the fair value base, as used by the commission, accrued depreciation was not deducted. The matter of accrued depreciation became important as affecting the annuity allowance considered in arriving at prospective income. The amount allowed by the commission as depreciation annuity was the sum of $1,072,000. The company claimed that the annuity should be not less than $2,344,744. The commission marked the inconsistency of the claim of the company to such a large amount for annuity depreciation, when it was claiming that the total accrued depreciation affecting its property was only the sum of $3,470,326. This, notwithstanding that the accumulated depreciation reserve for the gas department on December 31, 1929, amounted to $9,350,689. The commission's engineers computed depreciation amounts under straight line and sinking fund methods to be respectively $15,345,154, $7,774,867. The sinking fund method figure of $7,774,867 was the one referred to in the commission's opinion, and it appears that the method employed corresponds to the accounting practice of the company. It is to be noted that under accepted rules, as between straight line and sinking fund methods, the sinking fund base is undepreciated, while the straight line base is a depreciated base.

From the evidence presented, it appears quite clearly that annuity depreciation allowances made prior to the date of the rate hearing here concerned were in excess of what the company could properly claim. Prior allowances, if excessive, were not controlling. Depreciation was a matter not capable of definite ascertainment, and the commission had the right to use its judgment under all of the facts displayed before it, aided in weighing the evidence by its experience in dealing with this company's property and other like utilities, and to adopt a per cent. depreciation rather than the amount deducted by the company. It is not demonstrated by any evidence that the allowance made by the commission as for depreciation annuity for the future would not, in its amount, be equivalent to the replacement outlay at going costs.

The large amounts claimed by the company for cost of financing, $5,921,470; promoters' remuneration, $2,500,000; cost of attaching business (going concern value) $9,228,667; added "difficulty" costs, $580,195, we think, were properly rejected as for their total amounts. The company's claim was that these sums should be added to the present investment cost of its property on the theory that in fixing fair value it was entitled to assume an original venture to be promoted and built up over a contemplated period of eight years, saying, in effect: "If we were starting today to develop our business anew, without capital or customers, all of the amounts enumerated would probably be expended." Basically, the object of an appraisement for rate-making purposes is to find the full value of the investment in the business. The investment is represented by the value of the property used and necessary in the business—not what it would cost to promote and establish a like business starting today.

In fixing the estimated income for the future, the commission adjusted its figures to average temperatures. The company complained that at least the two preceding years had been attended by unusually high temperatures and consequent diminished demand for gas, and that it was improper to assume average temperatures. And yet the practice adopted was fair. We may note that the winter of 1931–32 in the city of Los Angeles, as it has thus far progressed at the end of January, has been one of the coldest in many years. And so, the rule of assumed average temperatures seems to be the only reasonable one to adopt. During unusually mild winters the utility service will earn less than was estimated to be allowed to it, and in colder winters will earn more. The commission recommended that a temperature reserve be established by the company and prescribed an alternate set of rates, to produce a larger return with a condition that the excess should feed the temperature reserve fund, so that income could be equalized between lean and productive years. This was not accepted by the company.

There were other amounts affecting the rates, which as to their kind and allocation were agreed to have been properly assigned, but as to the sufficiency of the allowances thereof the company made objection. For materials and supplies held for construction, the company claimed $612,735. The commission allowed $450,000. The commission was presented evidence showing that the average value amount of materials and supplies kept on hand by the company for the years 1927–1928 and 1929 was $612,735; and that in 1929 the amount was $571,000. The allowance of $450,000 for the year 1930 cannot be said to be arbitrary. The commission was authorized to determine within reason and fairness what sum would cover future needs.

For working cash capital, an amount of $2,333,850 was claimed; $645,000 was allowed. This item was to cover delayed income receipts, occasioned by the wait between time of delivery of gas to the consumer and collection of the charges. In brief, the company claimed a sum representing total earned amounts at retail prices. The commission found that cost of service should be considered, rather than retail charges, which latter would include profit. It considered, in computing the amount, the fact that the company, in its purchase of natural gas, was extended thirty days' credit. An offset was accordingly charged against the expense total in arriving at the result. We think the method used was a proper one.

Some smaller items were involved which in their amounts would not require a different decision, regardless of how they might be treated.

It is concluded that the plaintiff is not entitled to the relief demanded, and that its prayer for an injunction should be denied. Decree will be entered accordingly.

JACOBS, District Judge, concurs.

WILBUR, Circuit Judge (concurring).

The Los Angeles Gas & Electric Corporation, hereinafter called "the company" filed its bill in equity to restrain the enforcement of gas rates fixed by the railroad commission of the state of California upon the ground that the rates so fixed were confiscatory, to which an answer was filed by the railroad commission. Affidavits were filed by the plaintiff in support of a motion for temporary injunction. The railroad commission filed affidavits in reply, and the city of Los Angeles and the city of Pasadena intervened and filed affidavits in support of the rates fixed by the California state railroad commission, which will hereinafter be referred to as "the commission." Upon a hearing before the statutory court a temporary injunction was issued upon the giving of a satisfactory bond. This injunction resulted partly from the stipulation of counsel facilitating the disposition of the case. It was stipulated that the entire evidence which

had been adduced before the commission should be introduced and considered by this court upon its final determination of the issues involved, and this evidence, with the affidavits filed upon the motion for temporary injunction, should constitute the entire record for the consideration of the court. The case was thereupon submitted for decision upon the argument already presented upon the motion for an interlocutory injunction and upon briefs to be thereafter filed on behalf of the parties. Elaborate briefs were carefully prepared and present with great precision and emphasis the respective views of the parties. The method adopted for the presentation of this case has much to commend it. One of the great difficulties in the determination of cases involving the claim that rates fixed by public utility commissions are confiscatory and in violation of the Federal Constitution has arisen from the fact that the issue of confiscation is tried de novo in the federal court, the theory being that the sole concern of the federal court is with the question of confiscation, and that the function of the court so far as it relates to rate-making is to determine whether or not the rates fixed yield a return which is below the absolute minimum required to avoid confiscation. It has long been recognized by the federal court that, if the rate-making bodies would make specific findings of fact with relation to value and return, and particularly if they would make findings clearly showing that they had considered all the elements of value required by the decision of Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, and subsequent rate cases, to be considered, the work of the court would be much simplified, and that, while the federal courts must of necessity, in the use of their constitutional authority, exercise an independent judgment as to value and rate of return, the determination of the rate-making body upon conflicting evidence as to the various elements to-be considered in arriving at the value, and in the just determination of the rate to be arrived at by consideration of these elements of value, is entitled to great, though not controlling, weight. In the earlier stages of rate-making, when the problems involved were not thoroughly understood and some of the elements of value and expense were ignored, it sufficed if the court declared the particular rate to be less than the minimum permitted under the Constitution, and therefore enjoined the enforcement of the particular order involved, leaving the rate-making body to fix its rate at some point in excess of the minimum. As the constitutional principles established by the courts were better understood by those engaged in rate-making and more thoroughly developed by the courts, the exercise of a mere veto power on the part of the courts became increasingly unsatisfactory. The Supreme Court has always disclaimed either power or disposition to fix rates of public utilities, or any ability to do so, with the time and facilities at its command. Nevertheless, in later cases it has become desirable that the action of the court enjoining the enforcement of a rate established by a local rate-making body should be sufficiently definite and certain to serve as a guide for the rate-making body in a reconsideration of the problem. To that end in recent cases the Supreme Court has required findings of fact by the District Court acting as a statutory court, and these findings inevitably involve the fixing of a minimum fair return upon the property of the public utility. It is of course unnecessary in such findings to determine either of the elements essential in rate-making, that is, the fair value of the property and a fair rate of return thereon. It is only necessary to determine whether or not in the given instance the railroad commission has placed the income below the irreducible minimum. The commission fixed the fair value of the company's property at $65,500,000, and determined that 7 per cent. net was a fair return upon this value. The company claims that the fair value should have been fixed at not less than $95,000,000, and a fair return at not less than 8 per cent. In brief, the company claims that nearly $30,000,000 ($29,500,000) of its capital has been appropriated without compensation by refusal to give any return thereon, and that of the balance, capital sufficient to return an income of $655,000 (1 per cent. of $65,500,000) at 8 per cent. has also been confiscated, that is, $8,187,500, so that the total amount plaintiff claims will be confiscated by the proposed rates is $37,687,500 ($29,500,000, plus $8,187,500). Sixty per cent. of the company's property is devoted to the gas business and 40 per cent. to the electric business. Electric rates are not involved here. The amount thus claimed to be confiscated is almost double the par value of the entire common stock ($20,000,000) of the company and more than three times the amount thereof properly apportioned to the gas business ($12,000,000). In view of the fact that it is admitted that the proposed gas rates fixed by the commission will pay interest on that portion of the bonded indebtedness apportioned to the gas business (60 per cent. of $44,341,480 equals $26,604,-

888) at 5.96 per cent. and upon the preferred stock so apportioned (60 per cent. of $17,-330,317 equals $10,398,190) at 6.72 per cent., and upon the common stock apportioned to the gas business (60 per cent. of $20,000,000 equals $12,000,000) at 8.50 per cent., which is said to be the cost of such bond and stock money, or upon a total investment of $59,-003,078, interest at about 7.94 per cent., it is obvious that the contentions of the company should be scrutinized with care. On the other hand, as it is conceded by the commission that it has consistently throughout its history, as a rate-making body, followed the theory advanced by the minority members of the Supreme Court, particularly those advanced by Justice Brandeis and Justice Holmes in their numerous dissenting opinions, and has declined to follow the majority opinions of that court, which of course are authoritative and binding upon all courts and rate-making bodies, it is equally true also that the contentions of the commission must be scrutinized with care. The commission, in that regard, states its position in its opinion in the case at bar as follows:

"This Commission for many years, in the exercise of its jurisdiction to establish reasonable rates for utilities of this character, has fixed rates to yield *upon the historical or actual cost of the property, taking land, however, at current values and depreciation calculated on a sinking fund basis, a return somewhat in excess of the cost of the money invested in the property*. Where the books were accurately kept these have been deemed to most accurately reflect the actual cost of the structural and other property. Sometimes, when these were not reliable, it has been found necessary to estimate what it cost to produce the whole or parts of the property historically. (Re Coast Valleys Gas & Electric Co. (1917) 14 Cal. R. C. 460; Southern Sierras Power Co. (1920) 18 Cal. R. C. 818; Southern California Edison Company (1921) 19 Cal. R. C. 595, and (1923) 23 Cal. R. C. 981; San Joaquin Lt. & Pr. Corp. (1923) 21 Cal. R. C. 545; Pac. Gas & Elec. Co. (1922) 22 Cal. R. C. 744; Great Western Power Co. (1923) 22 Cal. R. C. 814; Pac. Tel. & Tel. Co. (1929) 33 Cal. R. C. 737.)

"Under rates fixed on this basis utilities of this character have grown strong and prosperous. They have experienced no difficulty in securing capital for extensions and new development. Confidence in investments in such utilities has increased and capital has flowed to this field of investment readily and at a gradually decreasing rate or cost." (Italics ours.)

The commission, of course, recognizes that the rule for the valuation of public utility property has been thoroughly and definitely settled by the Supreme Court, and concedes that its conclusions must be measured by that standard. It nevertheless contends that full consideration has been given to every element of value required to be considered, and that the valuations fixed by it in the case at bar are sustainable on either the theory of the majority or dissenting opinions of the Supreme Court. With these conflicting considerations in mind and before a detailed analysis of the subject, it should be stated that the larger elements of disagreement fall under two or three heads which can be separately considered, but before stating them we will consider in broader lines the contention of the respective parties. We do this because as to many of the facts entering into the problem the disagreement between the parties is comparatively trivial.

The commission states that the actual cash invested by the company in the gas properties of the company is $58,772,799. The amount of bonds and stocks attributable to the gas business, as above stated, is slightly more ($59,003,078). That is to say, the stock, bonds, and preferred stock money invested in the gas business of the company is from six to seven millions less than the rate base fixed by the commission. It is certainly satisfying at the outset of an investigation of alleged confiscatory rates to realize that the rate fixed is at least sufficiently high so that stockholders, as well as bondholders, are actually receiving a fair return upon their money invested, as distinguished from what may be determined to be a fair rate upon the value of their property devoted to public use.

In this connection it should be observed that, under the practice of the commission of basing its rates upon the historic cost of prudent investment theory, the stockholders are protected in their investment even if they do not reap the profits which are justly theirs under the rule established by the Supreme Court. Under this system adopted by the commission it should be stated that the holders of the common stock, although theoretically subject to the greatest hazard in the business, are protected in large measure from the hazards due to fluctuations in value of the property in which their money is invested and have the advantage of deriving, as income upon their stock and as a profit upon their investment, the difference between the interest paid to the bondholders and holders of preferred stock and the rate fixed by the

commission. In this connection it is interesting to observe that the holders of common stock would have their entire capital investment returned to them by way of dividends in about three years with the present financial set-up of the company and with the rates contended for by it (8 per cent.), so that their investment which is now largely derived from their profits under state regulation would be completely reimbursed in that short period.

In making these observations we are not to be deemed as accepting the rate-making system repudiated by the Supreme Court, which the commission itself acknowledges is erroneous, but the fact that the company has been largely financed under this system shows that the historic cost element of value should, perhaps, be given greater consideration than would be the case where a rate-making body for the first time fixes the rate of a going concern which has been financed without interference or supervision by the public officials. Here it should be stated that under the California system the commission, not only fixes rates, but has authority to determine the terms upon which and amounts for which stock and bonds of a public utility may be financed, and the company in this instance has procured most of its capital under this supervision. In addition, it has set up a bookkeeping system in accordance with the general rules of the commission, and as a result various items entering into the valuation of the company's plant can be readily determined. The expert testimony of competent engineers, in this case, is largely based upon these books. We have already indicated the manner in which the historic cost of the plant has been determined by the commission.

At this juncture and before further discussion of the method of valuation adopted by the commission and that contended for by the company, we will indicate the most important points of difference as to such values. The first difference is an item of $9,-288,667 for going concern value. The next large item is that of overhead of $9,144,988. It is next claimed that an excessive deduction was made by the commission for the accrued depreciation to be deducted from the value of the property new. It is claimed that this deduction was excessive by $4,179,674. In addition, the company claims $5,921,470 as estimated cost of financing. These factors, aggregating about $30,000,000, account in large measure for the $30,000,000 difference in value between the amounts fixed by the commission and the amount claimed by the company as the fair value of its property.

Before entering upon a discussion of these differences, it should be stated that the commission, in its opinion, most carefully considered these elements. It cannot be claimed that it ignored them unless the theory of its decision had that inevitable effect. It is conceded at the outset with reference to going value that this element must be considered in fixing the rate base. McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316.

Relation of Overhead, Going Concern Value, and Promotion Expenditures.

In view of the fact that the company is claiming nearly $25,000,000 for the sum of these three items in its claim of value, in addition to the amounts allowed by the railroad commission, and as these items constitute the major part of the claim of the company in so far as it relates to valuation, it should be stated at the outset that these three elements of value are more or less interrelated. Whether or not a given expenditure is to be treated as an element of the cost of construction, or of maintenance, or operation, is more or less a matter of judgment. Some or all of the expenses of promoting an enterprise may be appropriately considered as overhead charges and carried upon the books of the corporation as such. It is also true that expenditures involved in giving life to the dry bones of the enterprise may be treated as overhead charges, or as annual expenditures. That is to say, actual or assumed expenditures, for the purpose of producing the various results entitled to consideration as going concern value, or to be considered overhead, may be carried as promotion expenditures or treated as capital expenditures for attaching business involved in going concern value or as items of overhead, or they may be included in the allowance of annual expenditures charged against the income of the corporation. See Des Moines Gas Co. v. City of Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244; McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316. The importance of these observations which are sufficiently obvious lies in the fact that the commission failed to make a specific finding of going concern value upon the theory that the costs considered and allowed by it in determining the historic cost of the property included the cost of the acquisition of the going concern value, and that the allowance of $65,500,000 as a rate base was made in full recognition of the

going concern value, and that in determining the historic cost it had in effect appraised the going concern value. We quote from the opinion of the commission to that effect as follows:

"The Company claims $9,228,667 as going concern value, based largely upon the testimony of Col. Alten S. Miller. * * * Were going concern to be treated as an independent item of value, it should be measured with due regard to actualities rather than upon theories and assumptions such as employed by Col. Miller. And it would seem that what it did cost this Company to attach its business is a far more reliable guide than an estimate of what it might cost under a theoretical reconstruction program. By the prescribed accounting rules all costs incident to attaching business are required to find lodgment in New Business Expense. Col. Miller's position in essence is an attack upon the classification of New Business Expense as an operating item, his line of reasoning inferring that this expense should have been added to capital year by year. Were new business expense to be added to capital the corollary would be its elimination from operating expense. No very appreciable change in result would follow from allowing a reasonable amount in rate base to represent the cost of attaching the business (following largely Col. Miller's theory but reducing theory to actuality) and at the same time disallowing New Business Expense in operation.

"It is true that Col. Miller includes in his total figure $506,789 as 'cost of organizing property and personnel' but he does not attempt to explain how this figure is arrived at. The actual cost of building up the personnel and organizing the property has of course, under accounting procedure and Commission practice, been included in current operating expense, and if viewed in the light of capital expenditure, just as in the case of the cost of attaching the business, has been taken care of and in effect amortized year by year as incurred.

"Substance rather than form is to be considered. So viewed, this Commission does allow for the so-called intangible going concern value by treating its cost as a current operating expense."

In its reproduction cost it rejected the two items for promotion and financing aggregating $7,500,000 as unwarranted by the experience of the company, but it included in its estimate items which it held reasonably corresponded to these items as reflected by the actual history of the company. So far as

the rejection of the two items just referred to is concerned, we think the commission was correct in its conclusion if the regulation of rates is to be kept within the domain of practicality rather than fancy. See Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678. It is undoubtedly true that the engineers, in estimating reproduction costs, may fairly include items which in their judgment would be involved in the reconstruction of the whole enterprise. It does not follow that these figures must be accepted by the commission or by the court as items to be included in its actual value. It is no disparagement of the engineers to reject this testimony for the reason that reproduction cost, while necessary to be considered, is not the measure of the rate base, but an element to be given such weight as in the judgment of the rate-making body, and subsequently, of the court, is justified by the facts. As stated by Mr. Justice Brandeis, in McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 153, 71 L. Ed. 316, in his dissenting opinion: "There is, so far as I recall, no statement by this court that value is tantamount to reproduction cost."

And as stated by Mr. Justice Stone, in his dissenting opinion, in St. Louis & O'Fallon Ry. Co. v. United States, 279 U. S. 461, 49 S. Ct. 384, 410, 73 L. Ed. 798: "This court has said that present reproduction costs must be considered in ascertaining value for rate-making purposes. But it has not said that such evidence, when fairly considered, may not be outweighed by other considerations affecting value, or that any evidence of present reproduction costs, when compared with all the other factors affecting value, must be given a weight to which it is not entitled in the judgment of the tribunal 'informed by experience' and 'appointed by law' to deal with the very problem now presented."

The rule was stated by Justice Brandeis, speaking for a majority of the Supreme Court, in Georgia Ry. & Power Co. v. Railroad Commission (1923) 262 U. S. 625, 630, 43 S. Ct. 680, 681, 67 L. Ed. 1144, as follows: "The refusal of the commission and of the lower court to hold that, for rate-making purposes, the physical properties of a utility must be valued at the replacement cost, less depreciation was clearly correct."

Among the facts to be considered in determining value is the actual practical history of the enterprise as developed by the evidence. Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678; Greencastle Water Works Co. v. Pub.

Service Comm. (D. C.) 31 F.(2d) 600; Georgia Ry. & Power Co. v. Railroad Comm., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; Colorado Power Co. v. Halderman (D. C.) 295 F. 178; City of Winona v. Wisconsin-Minnesota Light & Power Co. (D. C.) 276 F. 996.

### Overhead Charges.

The contention that a portion of the overhead properly chargeable to a new enterprise or to reproduction value has been absorbed in current expense charges, and should not be again allowed as a capital expenditure, is even more emphatically and definitely urged.

During its history the company has kept its books in such fashion as to reflect in the historic cost that portion of the general expenses of the company it had determined were to be added to the capital investment and the portion which it claims should be paid from the current revenue of the company as an expense. The historic cost, therefore, as determined from its books, would include only that element of overhead which the company had charged on its books as a capital expenditure. The commission contends that it would be inequitable to permit the company to shift its ground after it has for years treated a portion of its expenditures as necessary expense incidental to its business to be deducted from the gross revenues, and now to claim that this amount, which it has already received as an incidental expense to be deducted from its gross revenue, should itself be treated as an investment upon which it must receive future income. Thus, it is claimed the consumers are required, not only to furnish the capital in the first place, but also to pay income upon the capital so furnished. The Supreme Court, however, has so definitely and emphatically held that the company is entitled to a reasonable rate of return upon the fair value of its property, regardless of whether or not that property was derived from the consumers by the imposition of excessive rates or otherwise (Board of Pub. Utilities Com'rs v. N. Y. Tel. Co., 271 U. S. 23, 46 S. Ct. 363, 70 L. Ed. 808), that the mere fact that an excessive amount may have been allowed to the company by way of income to cover expenditures is not decisive of the issue. We pause here, however, to advert to the fact that overhead is involved in both the historic cost and the reproduction value. It is clear, we think, that in considering the historic cost of the plant the company cannot include therein elements of value which have been apportioned to general expense and paid from the current revenues as an expense of operation.

In building up the historic value of the plant it is obvious under the system of bookkeeping devised by the commission and used by the company that it would be entirely illogical to include in the historic cost those expenditures which had been deliberately allocated to the routine and general expenditures of the business. On the other hand, it is clear that in determining the reproduction cost, that is to say, the cost of reproducing a plant as useful and efficient as that of the company, the assumed overhead, due to general expenditures necessarily incident to such rebuilding, should be apportioned upon a reasonable and scientific basis. It is upon the apportionment of these expenses that the experts disagree. It is estimated by the company's engineers that the overhead would add 24.27 per cent. to the cost of reproduction. It is conceded by the commission's engineers that the overhead percentage upon reproduction cost should be 22.32 per cent. The commission fixed as the overhead in its finding of fair value 6.35 per cent., a difference between the commission's finding and its engineers of 15.97 per cent., or $9,144,998, and a difference, on the basis of the company's engineers, of $2,374,743 more. It is therefore claimed that the rate base should have added to it at least $9,144,998. If then we accept the reproduction cost as the fair value it would seem to follow inevitably that this additional overhead should be allowed as a part of the capital investment. The company correctly claims that in rate-fixing the Supreme Court has indicated a decided preference for the reproduction cost as a determining factor in establishing value. If the Supreme Court had definitely held that the fair rate base could not be less than the reproduction cost, we would be constrained upon this issue of overhead alone to enjoin the rates fixed by the commission (Georgia Ry. & Power Co. v. R. R. Commission, supra), but it has not done so. It has left the fixing of the fair value of the property to be determined by the courts in the light of constitutional principles thoroughly established by it which require a consideration, not only of the cost of reproduction, which must necessarily be somewhat theoretical as we shall presently illustrate, but also its historical cost. If either was decisive of the value, it would be unnecessary to consider the other. If both are to be considered, judgment must be exercised in determining the value. McCardle v. Indianapolis Water Co., 272 U. S. 400, 410, 47 S. Ct. 144, 71 L. Ed. 316.

Assuming for the moment, as the commission decided, that the historic cost fixed

by it correctly recognized all overhead elements of value which the company in its system of bookkeeping and accounting had apportioned to capital, should the company now be permitted to augment its capital because reproduction cost would reflect greater overhead? It is a fundamental principle of equitable jurisprudence that he who seeks equity must do equity. The company in the case at bar is seeking the aid of a court of equity to exact from the consumers a larger amount than has been accorded to them by the commission. Should equity aid the company to again exact from the consumers income upon a sum which they have already paid to them, not as capital, but as income? We are not without authority upon this exact question. It has been held that this cannot be done. Natural Gas Co. v. Pub. Serv. Comm., 95 W. Va. 557, 121 S. E. 716.

It should be observed in connection with the item of overhead that we are not dealing with a definite item of property such as a gas main, but with a system of bookkeeping and accounting as to which judgments may differ; whether an attorney's fee paid by the company in the conduct of its business should be charged to capital and the expenditure added to the rate base; or whether it should be treated as an incidental expenditure in the management and control of its business, is obviously a matter of judgment upon which there can be no conclusive determination. It is in this situation that the commission allows the company to make an apportionment of its expenditures from year to year between .capital and operating expenses. We conclude, then, that the company cannot justly complain of an apportionment of its capital by the disallowance of its present claims of the overhead addition thereto, where the company has already been paid that overhead in conformity with its own claims that only 6.35 per cent. of it represented capital expenditure. The point is so important that we quote from the decision of the Supreme Court of West Virginia upon that exact point as follows: "We are of opinion that in any estimate of the present fair value of the company's property, based upon reproduction cost new, less depreciation, there may properly be included in such estimate a reasonable allowance for 'overhead charges,' if such charges have not already been paid as operating expenses, but the evidence as to the amount is too uncertain in this case for us to determine any particular sum. Upon further inquiry the commission can ascertain such amount as may be warranted by the evidence, and that sum, when so found, may be given

such weight, along with the other facts relevant to the inquiry, as the commission may deem proper. But no allowance for overhead costs should be made where they have already been paid by the public as operating expenses. The utility should not be permitted to capitalize such overhead charges and require the public to keep on paying a return on expenses already repaid the utility. If, however, it should be found that actual expenditures have heretofore been made for overhead costs which have not been charged to and paid as operating expense, allowance should be made therefor." Natural Gas Co. v. Pub. Serv. Comm., 95 W. Va. 557, 121 S. E. 716, 722. See, also, Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165, 35 S. Ct. 811, 59 L. Ed. 1244.

In this connection, however, it should be noted that the situation here is differentiated from that presented in the Board of Public Utility Com'rs v. N. Y. Telephone Co., 271 U. S. 23, 46 S. Ct. 363, 70 L. Ed. 808, the case much relied upon by the company in its contention that it is entitled to income upon the capital investment represented by overhead improperly charged to current expense. The Supreme Court in that case was dealing with a situation where the regulating board had expressly found that the returns allowed by it upon the fair value of the property were at least $1,300,000 less than the amount to which the company was entitled as a fair rate of return upon its property. The board in its findings made it clear that the only justification for the rate fixed by it was its contention that the company had accumulated an excessive depreciation reserve amounting to $16,902,530. The board, therefore, allowed a depreciation annuity of only $683,430, although it found that a proper annual allowance for depreciation and amortization would be $3,314,716. The difference between these two amounts was to be made up on the books of the company by appropriation from the previously received depreciation account. The Supreme Court held that, although the amount received by the company for previous years for depreciation might be excessive, the money, nevertheless, belonged to the company and could not be appropriated to reduce an appropriate and necessary annuity for depreciation as this would be in effect a confiscation of the property already owned by the company. In this connection, for the purpose of greater clarity, we quote from the decision of the Supreme Court (page 31 of 271 U. S., 46 S. Ct. 363, 366) as follows:

"The just compensation safeguarded to the utility by the Fourteenth Amendment is

a reasonable return on the value of the property used at the time that it is being used for the public service, and rates not sufficient to yield that return are confiscatory. Willcox v. Cons. Gas Co., 212 U. S. 19, 41, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; Bluefield Co. v. Pub. Serv. Comm., 262 U. S. 679, 692, 43 S. Ct. 675, 67 L. Ed. 1176. Constitutional protection against confiscation does not depend on the source of the money used to purchase the property. It is enough that it is used to render the service. San Joaquin Co. v. Stanislaus Co., 233 U. S. 454, 459, 34 S. Ct. 652, 58 L. Ed. 1041; Gas Light Co. v. Cedar Rapids, 144 Iowa, 426, 434, 120 N. W. 966, 48 L. R. A. (N. S.) 1025, 138 Am. St. Rep. 299, affirmed 223 U. S. 655, 32 S. Ct. 389, 56 L. Ed. 594; Cons. Gas Co. v. N. Y. (C. C.) 157 F. 849, 858, affirmed 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; Ames v. Union Pac. Ry. Co. (C. C.) 64 F. 165, 176. The customers are entitled to demand service and the company must comply. The company is entitled to just compensation and, to have the service, the customers must pay for it. The relation between the company and its customers is not that of partners, agent and principal, or trustee and beneficiary. Cf. Fall River Gas Works v. G. & E. Lt. Com'rs, 214 Mass. 529, 538, 102 N. E. 475. The revenue paid by the customers for service belongs to the company. The amount, if any, remaining after paying taxes and operating expenses, including the expense of depreciation, is the company's compensation for the use of its property. If there is no return, or if the amount is less than a reasonable return, the company must bear the loss. Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory. Galveston Elec. Co. v. Galveston, 258 U. S. 388, 395, 42 S. Ct. 351, 66 L. Ed. 678; Georgia Ry. v. R. R. Comm., 262 U. S. 625, 632, 43 S. Ct. 680, 67 L. Ed. 1144. And the law does not require the company to give up for the benefit of future subscribers any part of its accumulations from past operations. Profits of the past cannot be used to sustain confiscatory rates for the future. Newton v. Cons. Gas Co., 258 U. S. 165, 175, 42 S. Ct. 264, 66 L. Ed. 538; Galveston Elec. Co. v. Galveston, supra 396, of 258 U. S., 42 S. Ct. 351; Monroe Gaslight & Fuel Co. v. Michigan Pub. Ut. Comm. (D. C.) 292 F. 139, 147; City of Minneapolis v. Rand (C. C. A.) 285 F. 818, 823; Ga. Ry. & Pr. Co. v. R. R. Comm. (D. C.) 278 F. 242, 247, affirmed 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; Chicago Rys. Co. v. Ill. Commerce Comm. (D. C.) 277 F. 970, 980; Garden City v. Telephone Co., 236 F. 693, 696, 150 C. C. A. 25.

"Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other operating expenses, or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. Property paid for out of moneys received for service belongs to the company just as does that purchased out of proceeds of its bonds and stock. It is conceded that the exchange rates complained of are not sufficient to yield a just return after paying taxes and operating expenses, including a proper allowance for current depreciation. The property or money of the company represented by the credit balance in the reserve for depreciation cannot be used to make up the deficiency."

The difference between the situation presented to the Supreme Court in that case and the situation in the case at bar arises from the matter of judgment involved in determining to what extent overhead is a capital expenditure. Let us, for the purpose of illustration, reverse the situation and assume that the company, instead of charging only a part of the overhead to capital and the balance to operating expenses, had charged the full amount of 24.27 per cent. to capital. At the end of ten years let us assume that the regulating body concluded that only 6.35 per cent. should have been charged to capital and correspondingly reduced the capital of the company. It could claim, as the company now does, that the apportionment previously made was not scientifically correct. It could claim also that, although a change in the system of bookkeeping to conform to the new ruling would result in a loss to the company during the previous ten years during which the company had been apparently augmenting its capital at the expense of its income, the loss was nevertheless a past loss which the company was not entitled to have returned in future revenues. The claim of the commission in the hypothetical case would have behind it exactly the same logic which the company is advancing in support of its present position, except that in one case the commission is contending that the company is not entitled to recoup its losses, and in the other the company is claiming that the public is not entitled to recoup its losses, that is, the loss it suffered by excessive payment of

expense. We have little doubt that in the assumed case the court would hold that the commission could not shift its ground with reference to the overhead at the expense of the public utility, and we see no greater reason why the utility should be permitted to shift its ground at the expense of the public. In either case, it is clear that the historic overhead cost is a fairer basis for fixing the overhead involved in the value of the property than the reproduction overhead cost, scientifically apportioned. We conclude that, in choosing between the cost of reproduction overhead and the historic cost overhead, the commission was justified by the action of the company with reference to overhead in accepting the company's own historic contention with reference to overhead, that is, in acting upon its admission with reference thereto fixing it at 6.35 per cent. and in rejecting the overhead which reasonably would be included at a higher percentage (22.32 to 24.27 per cent.) of the reproduction cost. To restate the proposition, we conclude that, on the question of overhead, the commission was justified in accepting the historic cost of overhead rather than the reproduction cost of overhead, that is, that in the fixing of the value of the plaintiff's property the amount of indirect overhead to be applied to the valuation of the physical properties is 6.35·per cent.

### Going Concern Value.

It is thoroughly established that the company is entitled to have considered as part of the fair value of its property an intangible which is classed as "going concern value," that is to say, it is something in addition to the bare bones of the plant which would result from the physical reconstruction thereof. If we assume that the plant is constructed under a contract calling merely for the reproduction of its physical properties and the turning over of those properties complete but not yet operating, some larger amount than the contract price of reconstruction must be allowed in determining the value of the plant after it has become a going concern in successful operation. Primarily going concern value is included in the reproduction cost as an essential element of the reproduction of the property. The Supreme Court of the United States, in McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316, held that an estimate of 9.5 per cent. for going concern value, to be added to reproduction cost, was amply sustained by the evidence, and that the reported cases indicate that 10 per cent. of the physical elements of value would be a reasonable allowance for the intangible elements involved in going concern value.

The railroad commission expressly refused to make any specific allowance for going concern value. This is directly in the teeth of the decisions of the Supreme Court of the United States. McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316, supra. At page 414 of 272 U. S., 47 S. Ct. 144, 150, it is said: "The decisions of this court declare: 'That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is privately owned although dedicated to public use.' Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 165, 35 S. Ct. 811, 59 L. Ed. 1244; Denver v. Denver Union Water Co., 246 U. S. 178, 191, 192, 38 S. Ct. 278, 62 L. Ed. 649. And see National Waterworks Co. v. Kansas City, 62 F. 853, 865, 10 C. C. A. 653, 27 L. R. A. 827; [City of] Omaha v. Omaha Water Co., 218 U. S. 180, 202, 203, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084, and cases cited." It did, however, contend that all the elements making up going concern value had been paid for out of the current expenses of the company, notably the cost of attaching business, and had thus been allowed. It is relatively easy to estimate a going concern value to be added to the bare bones of the plant .in fixing reproduction cost, but comparatively, difficult to determine what amount should be added to the historic cost, or to the fair value of a plant long established, where, as here, the cost of attaching business and putting life into the enterprise has already been allowed as items of capital, investment, or current expense, under much the same conditions as in the cost of overhead expenditures. The Supreme Court, in Des Moines Gas Co. v. City of Des Moines, 238 U. S. ·153, 165, 35 S. Ct. 811, 815, 59 L. Ed. 1244, deals with that problem. We quote therefrom as follows:

"That there is an element of value in an assembled and established plant, doing business and earning money, over one not thus advanced, is self-evident. This element of value is a property right, and should be considered in determining the value of the property, upon which the owner has a right to make a fair return when the same is private-

ly owned although dedicated to public use. Each case must be controlled by its own circumstances, and the actual question here is: In view of the facts found, and the method of valuation used by him, did the master sufficiently include this element in determining the value of the property of this company for rate-making purposes?

"Included in going value as usually reckoned is the investment necessary to organizing and establishing the business which is not embraced in the value of its actual physical property. In this case, what may be called the inception cost of the enterprise entering into the establishing of a going concern had long since been incurred. The present company and its predecessors had long carried on business in the city of Des Moines, under other ordinances, and at higher rates than the ordinance in question established. For aught that appears in this record, these expenses may have been already compensated in rates charged and collected under former ordinances. As we have said, every presumption is in favor of the legitimate exercise of the rate-making power, and it is not to be presumed, without proof, that a company is under the necessity of making up losses and expenditures incidental to the experimental stage of its business.

"These items of expense in development are often called overhead charges, for which, as we have already seen, the master allowed 15 per cent upon the base value (exclusive of real estate) or $296,254, in addition to his allowance of $6,923 for organization expenses. * * *

"When, as here, a long established and successful plant of this character is valued for rate-making purposes, and the value of the property fixed as the master certifies upon the basis of a plant in successful operation, and overhead charges have been allowed for the items and in the sums already stated, it cannot be said, in view of the facts in this case, that the element of going value has not been given the consideration it deserves and the appellant's contention in this behalf is not sustained."

Regardless of how the company acquired the going concern value, it is entitled to have that value considered as a part of its investment. While somewhat the same principle is involved as in the case of the indirect overhead, the situation is not identical. Going concern value is something like the unearned increment of real estate. It is partly the result of the expenditures of the company, partly the result of the growth of the city, partly the result of the efficiency of management, partly the result of reputation of the company in its financial affairs, and the skill of its employees in so utilizing the property as to produce a reasonable revenue therefrom. We conclude that there are some elements of going concern value not included in the valuation of the company's property. In so far as the cost of reproduction new or the historic cost fixed by the commission includes the cost of attaching business, the cost of financing and promoting the going concern value has in part been taken care of by the allowance of these items as costs, but, if these elements are omitted, and it would seem to be the better practice to omit them in the estimate of the cost of reproduction, then the going concern value should be added to such cost to take care of such items of expenditure, not in exact amount of the expenditure which may or may not be reasonable or necessary, but by a general appraisal of going concern value to be fixed in the light of the necessary expenditures required to produce the going concern. Here, again, it should be noted that expenditures usually allowed as costs of conducting business in the accounts of a public utility should not be again charged to the public as capital expenditures. A new company in establishing its business would recognize that such expenditures were allowable as a legitimate expense of doing business, and a company long established has already had that advantage. Such an allowance for current expenditures is a reasonable expectation whether the company is a going concern or not. The commission expressly declines to appraise going concern value in estimating either the historic cost or the reproduction cost upon the ground that the current expenditures had taken care of the cost of acquiring the going concern value, and therefore that it would be inequitable to allow the company a going concern value in addition to the amounts already received from its revenue for current expenditures. While there is merit in the position, it cannot be maintained as to those intangibles not resulting from these expenditures, such as the growth of the city and the successful financial record of the company, that is, its credit. While good will and going concern value are not the same, neither can be measured by the exact standard of cost of doing business; however, in considering going concern value, it should be observed that, although the approved practice is to evaluate this item as an element in the fair value of the property, and then to determine a rate of income which would be fair, the real question in cases in-

volving confiscation by rates that are too low is one of adequate return. It is therefore immaterial whether the rate is lowered by a too low appraisal of the company's property, or by the fixing of the percentage of return too low on a higher valuation. Conversely, it matters not if the valuation is too low if the rate of return is correspondingly increased. The subdivision of the just compensation into elements of property on the one hand, and a return percentage thereof on the other, is a mere convenience for determining the question of confiscation. It is the actual result that is to be considered in determining whether or not the federal constitutional provision against appropriating property without just compensation has been violated. In this case the just compensation must be found in the rates fixed by the state. The net income measures the return of the compensation to the owners of the property. We think that the commission has recognized an element of going concern value in its method of rate-making by consistently allowing a net rate of return in excess of the cost of bond and preferred stock money. The cost of bond and preferred stock money is 6.17 per cent., the rate of return allowed is 7.7 per cent.' or 7 per cent., according to the undepreciated base selected. This policy on the part of the commission results in a profit to the common stockholders upon the bond and preferred stock investment. This profit results in part from the financial history of the company, from its standing in the community, from its credit, from the growth of the city, all elements of going concern value (McCardle v. Indianapolis Water Co., supra), which is thus definitely reflected in the relatively low cost of financing the project. The allowance of a profit on the bond and stock money necessarily results in a return on the going concern value. A profit of 1 per cent. on the bond and preferred stock money represents a return of 7 per cent. upon a capital investment of $5,286,154 (1/7 of $37,003,078= $5,286,154). This profit goes to the common stockholders to increase the returns on their investment beyond the 7 per cent. return on the value of the physical property ascribed to the investment of the common stock money. If we assume that 6.17 per cent. is a fair return upon the bond money, it also would be equally fair upon the common stockholders' money, if all hazard in the investment were eliminated, but the hazard to the common stockholders is reduced in part by the ability to readily finance or refinance the business at a relatively low rate of return.

In short, we think that the allowance of a reasonable profit to the common stockholders upon the cost of its bond and preferred stock money is as definite a recognition of some of the elements of going concern value as if in its estimate the commission had added a large sum to the fair value for going concern value. Thus, if we assume 7.7 per cent. used by the commission as the rate of return on the historic cost base as a fair return upon the fair value of the company's property, it would give the common stockholders a profit of 1.53 per cent. on every dollar invested by the bond and preferred stockholders, which would be equivalent to an addition to the fair value of the property of $7,352,559.61 at 7.7 per cent. While we do not say that this amounts to an addition of $7,352,559.61 to capital as going concern value, for the reason that stockholders by reason of increased hazard are obviously entitled to a greater return on their investment than the holders of bonds, and are thus entitled to make a profit on the bond and preferred stock money, nevertheless, it is obvious that the amount of such profit depends upon the credit of the company which forms a part of its going concern value. Having thus concluded that going concern value has been partially allowed in the historic overhead, in the historic current expenditures to the end of creating going concern value, and in the allowance of a profit on the bond and preferred stock money due to its credit, we pass the further consideration of that subject until our summation.

### Historic Cost.

The parties are not in serious disagreement as to the historic cost of the plant. This is partly because of the fact that the financing and accounting systems of the corporation have been so long under the control of the commission.

The commission found the historic cost of the company's property to be $60,704,000. This estimate is based upon an appraisal of the company's property made in 1915 and adopted by the commission in 1917 as the fair value, plus the net cost of additions and betterments to the property from 1915 to 1929, inclusive, as recorded on the books of the company during those years, plus an appraisal of the value of lands made by the commission's engineers as of December 31, 1929, plus working capital, etc. We append in the margin a "breakdown" of this total as shown in the commission's decision for further explanation of the totals considered in

the historical cost, plus the appreciation of real estate values, etc.[1]

This, of course, is the historic cost unless the appraisal made in 1915 and acted upon ever since by the commission and by the company is erroneous. No serious fault is found with the appraisal of 1915. The company tabulates the "historic reproduction cost appraisals" in its brief as follows:

This table fairly indicates the points of difference in the appraisals of historic cost and the historic cost rate base as fixed by the commission to be in items of overhead, materials and supplies, brokerage fees, and one-half of additions and betterments for 1930. The item of overhead has been hereinbefore dealt with, and the conclusion arrived at is that historic overhead of 6.35 per cent.

## HISTORICAL REPRODUCTION COST APPRAISAL

| | Appraisal of Company Engineers | Appraisal of Commission Engineers | As Fixed by Commission in Decision |
|---|---|---|---|
| Intangible Capital as of January 1, 1930 | | | |
| Organization | $ 365,529 | $ 365,529 | $ 415,735 |
| Franchises | 12,406 | 12,406 | 13,391 |
| Total Intangible Capital | 377,935 | 377,935 | 429,126 |
| Tangible Capital as of January 1, 1930 | | | |
| Land | 3,893,370 | 3,693,191 | 3,500,888 |
| Production Capital | 14,304,373 | 14,304,373 | 19,215,650² |
| Distribution Capital | 34,596,784 | 34,126,513 | 32,205,912² |
| General Capital | 2,760,217 | 2,758,809 | 3,335,611² |
| Sub-total | 55,554,744 | 54,882,886 | 58,258,061 |
| Overheads | 7,480,567 | 5,758,841 | ......... |
| Additional Allowance for Interest During Construction | ......... | ......... | 155,000 |
| Total Tangible Capital | 63,035,311 | 60,641,727 | 58,413,061 |
| Total Tangible and Intangible Capital, as of January 1, 1930 | 63,413,246 | 61,019,662 | 58,842,187 |
| Materials and Supplies | 612,735 ⎫<br>2,333,850 ⎭ | 810,000 | ⎧ 450,000<br>⎩ 645,000 |
| Working Cash Capital Cost of Brokerage and Issuance Expense on Bonds Outstanding Against the Gas Department, as of January 1, 1930 | 1,147,802 | ......... | ......... |
| One-half Estimated Additions and Betterments for the year 1930 | 1,054,255 | ......... | 767,103 |
| Total, Exclusive of Going Concern Value | $68,561,888 | $61,829,662 | $60,704,290 |

[1] The breakdown of the rate base figure used for 1930 is as follows:

Intangible capital as of December 31, 1929:
Organization .................. $ 415,735
Franchises .................... 13,391

Total Intangible Capital .. $ 429,126

Tangible Capital as of December 31, 1929:
Land .......................... $ 3,500,888
Production Capital ........... 19,215,650
Distribution Capital ......... 32,205,912
General Capital .............. 3,335,611

Total Tangible Capital... 58,258,061
Additional Allowance for Interest during Construction ..................... $ 155,000
Grand Total Fixed Capital as of December 31, 1929 ....................... 58,842,187
One-half (Company's Estimate) Net Additions and Betterments for 1930......... 767,103
Average Fixed Capital, 1930................ 59,609,290
Materials and Supplies..................... 450,000
Working Cash Capital....................... 645,000
Rate Base ......·.......................... 60,704,290
Rate Base Used .....................·...... 60,704,000

Estimates of the historical cost of the structural property were made in this proceeding, both by the company and by the commission's valuation department. Excluding overheads, the company reached a figure approximately $300,000 higher than the one obtained by taking the 1917 rate base as fixed by the commission in its first decision and building up on that, while the valuation department of the

is the proper allowance for this item. The other items going to make up the difference will be considered in the summary.

### Reproduction Cost.

With reference to reproduction cost, the position of the commission is stated in its brief as follows:

"Effect of Price Changes.

"The wide variation between estimates of reproduction cost and actual cost of this commission reached a figure approximately $300,-000 lower than the one thus obtained. The fact that each of these estimates, independently reached by employing somewhat different methods and procedure, corresponded so closely to the historical cost figure as used and accepted by the commission and by the company as correct in the series of rate determinations running from 1917 to 1928 confirms its substantial accuracy. The figure used conforms to the accounting practice of the company as to the bulk of its investment, which has increased from approximately $13,000,000 in 1917 to over $58,-000,000 in 1929, the difference representing net additions and betterments during this period as inscribed in the company's books and records. Mr. McAuliffe and the company's land appraiser were surprisingly close in their results. In the few points of difference Mr. McAuliffe's testimony was the more convincing.

² Including overheads.

property as of December 31, 1929, is not attributable to changes in price level. It is very largely due to the assumption of engineers that many costs will be incurred which were never actually incurred nor actually treated as capital charges. This may be plainly illustrated by an examination of the various estimates of cost to produce new the existing physical properties alone before the addition of land, overheads, and intangibles, and comparing them with the historical cost estimates on the same basis:

|  | Company Estimate | Commission Estimate |
|---|---|---|
| Cost to reproduce using one day unit prices of Dec. 31, 1929, excluding overheads, land and intangibles....... | $57,871,271 | $56,681,075 |
| Historical cost, excluding overheads, land and intangibles ...................... | 51,661,374 | 51,189,795 |
| Difference between cost to reproduce and historical cost | $ 6,209,897 | $ 5,491,280 |

"Of these differences, it is admitted by plaintiff that $580,195 represents costs due solely to existing difficulties of construction in the streets not present when construction was actually done. Deducting such difficulty factor, the remainder represents true price changes between the various actual construction dates and December 31, 1929. Giving effect to a further reduction in prices between December 31, 1929, and June 15, 1930, as testified by the Commission's engineer, there would be a further deduction of $354,065. Comparing the reproduction estimates as shown in Commission's Engineer's Exhibit No. 52 using average prices of the four years preceding the date of valuation, there is shown, therefore, that the result obtained by using one day unit prices of December 31, 1929, was $307,152 below the four-year average, and by using one day unit prices of June 15, 1930, the reduction is $661,217 below the four-year average.

"Further illustration of the manner in which the Company sought to build up its reproduction cost new value, and the comparison of these values with its historical cost estimate, is shown by the following table:

imately fifty per cent above its estimate of actual cost, and, of the assumed increased costs, not more than one-fifth is represented by increased cost of the physical properties alone before the inclusion of indirect charges under the heading of overheads, organization, promotion, etc."

In view of the importance of the decision of the Supreme Court in McCardle v. Indianapolis Water Co., supra, with relation to the weight to be given to reproduction cost as against historic cost in determining the rate base, we proceed to a further consideration of that decision. An examination of the record in that case shows that the cost of reproduction of the physical property only, less depreciation, as estimated by the various engineers upon the different bases, varies from $13,979,774, estimated by the board's engineer for reproduction at average prices for ten years ending in 1920, to $17,328,249, by the same engineer spot prices on October 1, 1922. The engineers for the company gave estimates from $16,020,456, on average prices for ten years ending 1920 to $20,535,543 on average prices for five years ending 1921, and for spot prices October 1, 1922, $19,447,193. The board's engineer gave the estimate of $17,000,000 for the reproduction cost as of January 1, 1924, based upon average prices in the ten years ending with 1923. Apparently the Supreme Court accepted this estimate of the board's engineer for reproduction cost ($17,000,000) as "substantially less than the amount fairly attributable to the physical elements of the property," and added thereto slightly more than 10 per cent. ($1,865,000) "to cover water rights and going value and also $135,000 for cash working capital," giving a rate base of $19,000,000 as a minimum.

It will be observed that the Supreme Court was there dealing with reproduction cost at a time when the cost of labor and material had been greatly advanced over the historic cost. The court stated that: "The high level of prices and wages prevailing in 1922 and 1923 should be taken into account

|  | Historical Cost Estimate of Company | Reproduction Estimate of Company | Difference |
|---|---|---|---|
| Physical properties (base above)..................... | $51,661,374 | $57,871,271 | $ 6,209,897 |
| Organization and franchises.......................... | 377,935 | 831,781 | 453,846 |
| Lands (without overheads)............................ | 3,893,370 | 3,893,370 | ......... |
| Overheads .......................................... | 7,480,567 | 14,990,278 | 7,509,711 |
| Cost of financing.................................... | ......... | 5,921,470 | 5,921,470 |
| Promoter's remuneration ............................ | ......... | 2,500,000 | 2,500,000 |
| Cost of attaching business (Going Concern).......... | ......... | 9,228,667 | 9,228,637 |
|  | $63,413,246 | $95,236,837 | $31,823,591 |

"It appears, therefore, that the Company's estimate to reproduce new is approx-

in finding value as of January 1, 1924; and in the years immediately following. More-

over, there is nothing in the record to indicate that the prices prevailing at the effective date of the rate order were likely to decline within a reasonable time—one, two, or three years—to the level of the average in the ten years ending with 1923. And we may take judicial notice of the fact that there has been no substantial general decline in the prices of labor and materials since that time. The trend has been upward rather than downward. The price level adopted by the commission—the average for ten years ending with 1921—was too low. And it is clear that a level of prices higher than the average prevailing in the ten years ending with 1923 should be taken as the measure of value of the structural elements on and following the effective date of the rate order complained of."

The Supreme Court in this case very clearly indicated that, where there had been so marked an increase in value over so long a period of time, and likely to continue so long after the time when the rates were fixed, it was necessary to recognize this higher cost in fixing the rate base, and that the historical cost should not be accepted where it was based upon a long period of relatively low cost of labor and material.

In the case at bar we have the situation exactly reversed. The current rates for labor and material have gradually decreased owing to the depression.

Prices have depreciated so that at the time of the hearing an affidavit was filed on behalf of the commission by Mr. Dufour, one of the engineers of the commission, estimating that the reproduction cost of the company's property at prices prevailing December 15, 1930, including land at market value as of December 31, 1929, and, excluding difficulty factor, is $60,009,099 undepreciated. We quote as follows from the affidavit: "That said figure would represent the cost of the properties as they existed December 31, 1929, if the unit costs and prices prevailing on December 15, 1930, were used, applying overhead charges of six per cent, the average amount actually charged by the company on its books from 1913 to 1929, inclusive, and including land at market value as of December 31, 1929; that the current price level costs of $60,009,099 as of December 15, 1930, is only $1,321,912 or 2.25 per cent higher than the actual historical cost." This amount, it will be observed, is over $5,000,000 less than the fair value of the property as fixed by the commission. It does not include going concern value. On the other hand, it is undepreciated. If we add approximately 10 per cent. to this for going concern value, we have an undepreciated base of $66,010,008.90. If we deduct therefrom the depreciation contended for by the company, $3,470,326, we have a depreciated base estimated on cost of reproduction on December 15, 1930, plus going concern value less depreciation of $62,539,682.90, whereas, if we accept the depreciation fixed by the commission, $7,650,000, we would have a depreciated rate base of $58,360,008.90 after allowing 10 per cent. for going concern value. Accepting the company's figures for depreciation, the rate base is approximately $3,000,000 less than that taken by the commission, and, if we accept the commission's estimate of depreciation, we have a rate base over $7,000,000 less than that fixed by the commission as the fair value of the property. In other words, upon the price levels of December 15, 1930, we would have ample allowance for going concern value in the $65,500,000 undepreciated rate base fixed by the commission. Lest we be misunderstood, we hasten to say that we are using the figures of Mr. Dufour's affidavit for purpose of illustration rather than as binding conclusions to be adopted by this court, because they are at "spot prices" of December 15, 1930. They illustrate the effect of the falling prices, and this court will take judicial notice that the costs of reproduction were lessened during the year in which the old rates have been collected by reason of the temporary injunction herein (January 1, 1931, to January 1, 1932). As to judicial notice, see Atchison, T. & S. F. R. Co. v. United States, 284 U. S. 248, 52 S. Ct. 146, 76 L. Ed. ——, decided January 4, 1932. However, it has been definitely decided by the Supreme Court that spot prices, that is, prices on a particular day, assumed as a basis for capitalization, is not the proper method of determining reproduction costs. McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316, supra. This, of course, is not only settled by authority, but also is clearly reasonable, for the value of the plant taking years to construct and involving large outlays during a period of fluctuating prices should not be judged by the arbitrary selection of a date as controlling price levels during the entire period. The method sanctioned by the Supreme Court in McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316, supra, was a determination of reproduction cost upon a ten-year average. The engineers in the case at bar, as will be presently indicated, in determining the reproduction cost, se-

276

lected a four-year period of reconstruction and adopted an average price during that period. So far as the question of overhead is concerned in fixing the fair value of the plaintiff's property, we have already expressed the opinion that the position of the company, while theoretically correct, that is, while a proper reproduction cost would include the overhead properly applicable thereto, testified to be from 24.27 per cent. to 22.32 per cent., nevertheless, in determining the fair value of the company's property, in view of the historic method of subdivision of its overhead expenditures between current expense and capital, the fair valuation of the property should be based upon the method of distribution of overhead adopted and maintained by the company for many years, and this may appropriately be done by giving priority to historic value on overhead rather than estimated cost in reproduction value, in determining the amount of overhead applicable to the fair value of the property. We will revert to a more detailed consideration of these exact estimates by the engineers in our summary; but before doing so will take up the subject of

### Depreciation and Obsolescence.

The subject is one of great difficulty which has received a great deal of attention by rate-making bodies and by the courts because it is reflected in the rates fixed for public utilities in two ways. First, it affects the value of the property, and, second, it affects the annual allowance called the "depreciation annuity" to be deducted from the gross revenue to offset the current depreciation. It is to the interests of the public utility to minimize as much as possible accrued depreciation because it is deducted from the rate base, and to increase as much as possible the annual allowance for depreciation which is deducted from its gross receipts as an expenditure. This situation is emphasized by the contentions made by the company in the case at bar. It has accumulated a depreciation reserve of $9,350,689 in its gas department. It is claimed by the company that the commission deducted for depreciation $7,650,000, whereas the company contends that the amount which should have been deducted from the value of its property new for accrued depreciation during the entire history of the company is a total of only $3,470,326. Thus, the amount claimed as accrued depreciation by the company is $5,880,363, less than the amount they have set aside as a reserve to take care of that depreciation. The company also claims, however, that it

should have been allowed, as a depreciation annuity for current depreciation, $1,300,000. In short, the company claims an annuity for depreciation which would in three years equal the total depreciation which it contends has accumulated during its entire history. These observations of the incongruity of the company's claims are made at the outset of the discussion of depreciation to indicate the inherent difficulties in the situation. It has been established that the amount accumulated for depreciation reserve cannot be utilized as a basis for diminishing the annual allowance for depreciation below a reasonable sum fixed therefor. Board of Pub. Utility Com'rs · v. N. Y. Tel. Co., 271 U. S. 23, 46 S. Ct. 363, 70 L. Ed. 808. It is recognized by the commission in its decision, by the experts in their testimony, and by the attorneys in their briefs, that the "sinking fund method" of estimating depreciation is not the correct basis, but that the question of actual depreciation is the test. The fundamental difference in the rule is well illustrated by the contention of the city of Los Angeles, intervener herein, with relation to the obsolescence of the manufacturing plant of the company. It is claimed by the city that, although the commission included about $10,917,727 as the valuation of the gas manufacturing plant, the necessity for the plant is completely obviated by the use of natural gas. It is therefore claimed that the rate base fixed by the commission is $10,917,727 too great for that reason. While it is conceded, as stated, that actual depreciation should be ascertained, that test is not easy to apply, particularly in the case of partial or complete obsolescence.

The commission's engineer, Wehe, in the case at bar, fixed the actual accrued depreciation estimated on the straight line basis at $15,345,154. He also estimated the accrued depreciation by the sinking fund method to be $7,774,867. Neither method treated the manufacturing plant as obsolete. The accumulated depreciation reserved for the gas department is $9,350,689. The company's estimate for accrued depreciation was that by Engineer Luick. It is claimed by the company that the testimony of Engineer Wehe is based upon a mere theory rather than actual observation, and that the company's engineer, Luick, after a detailed physical examination of the property, appraised the accrued and realized depreciation, including functional deterioration, at $3,470,326. The position of the commission with reference to the testimony of Mr. Luick can best be stated in the terms of its brief: "Mr.

Luick testified that the total accrued depreciation on all gas property was only $3,470,326. This he attempted to support by the claim that by the expenditure of such sum the property could be restored to a condition as good as new. On meters and regulators, for example, which represent about $6,000,000 in capital, and in place for many years, he gives an accrued depreciation of only $155,000, and testified that with such repairs they would be made just as good as new. Yet it was his judgment that there should be set aside annually to a depreciation reserve the sum of $109,000 for these same units of property. His estimate of $1,300,000 for total depreciation expense has no relation to his actual accrued depreciation, nor was it based upon any study of the Company's actual needs. As he testified, it was his theory that the depreciation reserve, to which an annual allowance of $1,300,000 should be made, was merely a contingency fund to safeguard the Company against possibilities that cannot be foreseen. His treatment of the capital deduction because of depreciation already accrued and of the annual expense allowance therefor was obviously inconsistent."

The commission allowed $7,650,000, based upon the testimony of commission's engineer, Wehe, but did not deduct the depreciation from the rate base. The city of Los Angeles, intervener, in dealing with the question of depreciation, called attention to the fact that the total value of $10,917,727 for manufacturing plant and equipment is not used or useful in the manufacture of gas by reason of the use of natural gas. It is stated:

"The record shows that the manufacturing plants have not been used subsequent to 1927, save and except in the year 1928 at the time of the St. Francis Dam disaster when the plants were warmed up so that they could be put into operation in the event it became necessary.

"Manufactured gas could not be used in the City of Los Angeles with any degree of success or satisfaction without a change in all of the gas-burning appliances in the city for the reason that the appliances are now adjusted for natural gas. Before manufactured gas could be used it would be necessary to make a change. This change would require a long period of time, and by the time the change was made in the gas-burning appliances, any break which might occur to the many transmission lines which convey natural gas to the City of Los Angeles, or other interruption to service, could be remedied before the change of gas appliances could be effected.

"The Company contends that the gas-manufacturing plants are necessary as a standby plant. We contend that the plants are not now being used and have not been used for several years as such, which shows that they are no longer used or useful in the public service, and therefore their value should have been excluded from the rate base."

On this subject of obsolescence the findings of the commission are as follows:

"Generating Plants.

"No deduction is made on account of the Company's artificial generating plants and equipment being rendered unnecessary by the introduction of natural gas. There can be no question that money invested in these was invested prudently and in good faith. When made, at least, the investment was a proper and necessary one. The theory of the basis of testing rates here under consideration contemplates protection of investments thus made. Were the cost of these plants deducted from the *base it would be necessary to provide for its amortization.* The City's set-up provides for their amortization over a longer period of time than their normal life expectancy upon which current depreciation expense is calculated. A shorter and more logical amortization period would substantially change the result. *While the evidence adduced by the city in respect to these plants presents a serious question as to whether all of the investment they represent should be continued in the rate base,* it is not established with sufficient definiteness that the elimination of the whole or a part of the investment *would be fair to the Company,* or to the interest of the consumers. A somewhat different situation arises in connection with the Company's claims to the reproduction value of these plants. This is treated under Part III." (Italics ours.)

It will be noted that the commission is of the opinion that a finding that the manufacturing plant was neither used nor useful, and therefore that its value should be deducted from the rate base, would necessitate the return of such lost value to the company by rates which would require the consumers of gas to pay therefor, in installments over a period to be fixed by the commission—a theory entirely untenable upon the basis of the decisions of the Supreme Court. The real question is whether its value can justly be included, in whole or in part, in the rate base, and to that extent only can its value be considered. It is also found by the commission that, "the evidence convincingly and satis-

factorily establishes the existence of a natural gas supply adequate for years to come." It is obvious that the commission, in continuing as a capital investment the manufacturing plant of the company, did so on the untenable prudent investment theory. Neither the company nor the commission complained of this method of treatment of the obsolete manufacturing plant of the company, and the city of Los Angeles only mildly complains thereof and suggests that the finding of the commission, being an exercise of sound discretion, is binding. But we are not bound by the decision of the commission. If we were, this suit would be at an end. For instance, if it appears from the record that the commission has included in its rate base $10,917,727 of worthless property upon which the company is not entitled to income, and has erroneously excluded a like amount upon which the company is entitled to an income (such as going concern value, etc.), we could not hold that the rate was confiscatory because the rate base was too small. On the contrary, the rate base would be exactly correct. While rates fixed by rate-making bodies are attacked in the courts upon a claim of confiscation advanced by the public utility corporation, the rate fixed may be actually excessive instead of confiscatory. A fair-minded commission is as apt to err in favor of the company as in favor of the consumer. It may be the duty of this court in determining the question of confiscation to determine the question as to whether or not the historic or reproduction cost of the gas manufacturing plant of the company, or any part thereof, is to be included in the rate base, notwithstanding the fact that the commission included it in its rate base. We are, however, only concerned with the question of confiscation, and, if we can say that the rate fixed is not unreasonable, having due consideration for the factors involved including the admitted partial, if not total, obsolescence of the manufacturing plant, it will be unnecessary to attempt the solution of the problem which has been considered doubtful by the commission and been avoided by the parties other than the intervening cities of Los Angeles and Pasadena.

With these preliminary observations we turn to a further consideration of the evidence.

In the first place, it should be again noted in this connection that the commission has been using the sinking fund theory as a basis of estimating depreciation, which is expressly repudiated by the Supreme Court in the case of Pacific Gas & Elec. Co. v. City and County of San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075. The company relies strongly upon this decision as determining that actual and observed physical deterioration is the proper basis for fixing the accrued depreciation. The Supreme Court in that case, not only did not decide that actual depreciation is controlling, but decided exactly to the contrary, although it is true that the author of the opinion manifests a decided preference for the actual facts with reference to depreciation as distinguished from theoretical computations on age or use or a sinking fund allowance. This, we think, is obviously the correct basis for determining accrued depreciation in fixing the rate base where that base is the present value of the property. In other words, the two propositions are interdependent. If the rate base is the present value of the property, then, obviously, the actual deterioration is an amount which should be deducted from the value of the plant if it were new. This conclusion, which is now well established, was once in grave doubt and was determined by a divided court. Pacific Gas & Elec. Co. v. City and County of San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075, supra. As a corollary to that proposition, it follows that accruing depreciation, or depreciation annuity, is to be estimated upon the present value of the property as depreciated. This was also decided by a divided court in Board of Public Utility Com'rs v. N. Y. Tel. Co., 271 U. S. 23, 46 S. Ct. 363, 70 L. Ed. 808, supra; United Railways & Electric Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390. We would not emphasize the fact that these points were decided by a divided court were it not for the fact that the commission, in this case and, it says, in all others, has been inclined to follow the minority rather than the majority holding of the Supreme Court. It has allowed the accumulation of a reserve to meet accrued depreciation upon the rejected sinking fund theory. It does not follow, however, that in determining its present conclusions fixing rates for the company's property it has entirely ignored the decisions of the Supreme Court. On the contrary, it seeks to sustain the rates it has fixed by reference to the principles determined by the majority of the Supreme Court in its numerous decisions. In its brief the commission states: "What the defendant Commission may believe to be the proper basis for utility rate-making cannot in any respect be taken as evidence of what it actually did in this case. The Commission very clearly and

properly was first concerned with a rate of return which would protect this utility in its actual investment and permit it to continue to grow and successfully function as it has in the past under a regulatory policy which it admits has made prudent investment the primary test of value. The Commission need offer no apology for the acceptance in the past, or its preference as a rule for the future, of a basis for utility rate-making, which has in its experience proved sound, and the acceptance of which as the law of the land has frequently been urged in dissenting opinions by Justices of the Supreme Court itself. See City of Houston v. Southwestern Bell Tel. Co. (1922) 259 U. S. 318, [42 S. Ct. 486, 66 L. Ed. 961]; St. Louis & O'Fallon Ry. v. U. S. (1929) 279 U. S. 461, 49 S. Ct. 384, 73 L. Ed. 798; United Railways v. West (1930) 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390."

The commissioner's brief also calls attention to some of the incongruities arising from the situation which have developed in the practical operation of the company under the direction and control of the commission. As illustrative of the situation we quote from the commission's brief as follows:

"The Commission's engineer determined the accrued depreciation on both straight line and sinking fund bases. By the first method, he found it to be $15,345,154 and by the second $7,774,867. If the computed figure of $2,344,744 used by plaintiff in its brief for depreciation annuity on a straight line basis be accepted as correct, then a depreciated rate base computed by the same method must also be accepted, which would be approximately $50,000,000. But, as the Commission stated in its decision, the estimate of its engineer of $1,072,000 for the depreciation annuity was computed on a sinking fund basis and to go only with an undepreciated base. [It should be here noted that the record shows that $65,500,000 fixed by the Commission as the fair value is an undepreciated base.] Therefore, as stated in the opinion of the Interstate Commerce Commission above quoted [Depreciation Charges of Telephone and Steam Railroad Companies, 118 I. C. C. 295, 355] the Commission's treatment of accrued depreciation by leaving it in the rate base while computing the annuity on an appropriate sinking fund basis was entirely consistent. If a straight line annuity were used, the base must necessarily be reduced by the only straight line accrued depreciation estimate in the record, namely $15,345,154.

"One other factor should be noted having a direct bearing on the depreciation annuity. The Company's claim of accrued depreciation arrived at by the 'cost to restore' method was only $3,470,326. The accumulated depreciation reserve for the gas department on December 31, 1929, was $9,350,689. The Company's witness would, nevertheless, add to the reserve not less than $1,300,000 annually, although he admitted that, after deducting his estimate for accrued depreciation, the reserve would be held as a mere contingency fund to meet extraordinary emergencies, and the amount in the reserve would not necessarily have any relation to the accrued depreciation. Necessarily, we submit, the present reserve for depreciation, and the allowance to be made annually to augment the reserve, must have some relation to the accrued depreciation. As was said in the latest decision of the Supreme Court, Smith v. Illinois Bell Tel. Co., 282 U. S. 133, 158, 51 S. Ct. 65, 75 L. Ed. 255:

"'While it has been held by this Court that property paid for out of moneys received for past services belongs to the Company, and that the property represented by the credit balance in the reserve for depreciation cannot be used to support the imposition of a confiscatory rate (Board of Public Utility Com'rs v. New York Teleph. Co., 271 U. S. 23, 70 L. Ed. 808, 46 S. Ct. 363), it is evident that past experience is an indication of the company's requirements for the future. The recognition of the ownership of the property represented by the reserve does not make it necessary to allow similar accumulations to go on if experience shows that these are excessive.'

"Attention should be called to the growing ratio in recent years which the Company's depreciation reserve bears to its fixed capital. Mr. Wehe in his affidavit on file shows this relationship in respect to the four capital groups, Mains, Services, Meters, and Regulators, which plaintiff says constitute the major portion of its fixed capital. His table shows that the reserve is now over 18 per cent of the total of these capital units and that the ratio of the reserve to capital has shown a marked and continuous increase.

"Therefore, it was entirely immaterial that the Commission in this case and in others has preferred to use an undepreciated rate base. The annual depreciation expense was computed to go with an undepreciated base, and this was most liberally computed. If the Company now for the first time wishes to urge the acceptance of an annuity computed on a straight line basis, it must accept a

rate base with full straight line accrued depreciation deducted. This, as we have shown, is not less than $15,345,154, the only straight line estimate made, and undisputed in the record.

"In the plaintiff's brief it states that the estimate of its engineer of only $3,470,326 for accrued depreciation was determined after a physical inventory and appraisal in accordance with accepted methods."

Notwithstanding the position of the commission, it is definitely and authoritatively determined that the rate base must be determined by proper deduction for actual depreciation and the annual allowance for depreciation must reasonably reflect the actual depreciation reasonably to be expected annually during the existence of the current rate. In a gas rate case from California, the Supreme Court in Pacific Gas & Elec. Co. v. City and County of San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. Ed. 1075, supra, was not only called upon to consider an elaborate exposition by the master of the various methods of estimating depreciation, but also to determine the question of the effect of obsolescence due to the adoption of new machinery. It was conceded in that case that the original gas manufacturing plant of the company was absolutely worthless and had been replaced by a new manufacturing plant which could make gas so much more economically that gas could be furnished to the consumers at a reduced rate and at the same time make an adequate return upon the capital invested in both old and new manufacturing plants. In this situation the court called attention to the fact that it would be unjust to the company to reduce its capital investment by the amount of the obsolete plant and only allow income upon the new plant where the effect of the new investment was in the interests of the consuming public from any possible point of view. The court there said (page 415 of 265 U. S., 44 S. Ct. 537, 540): "Obviously, under the theory accepted below, appellant worsened its situation for rate-making purposes when it reduced the cost of manufacturing gas. Introduction of successful patented inventions enabled the public authorities to lower the rate base and gather all the benefits. The operating plant, made capable of producing gas at smaller cost, was declared less valuable than before. The result indicates error somewhere, either in theory or application of principle." Now, it is obvious that, upon the formula that the rate base is the present value of the plant new, less actual depreciation, the value of the old and useless manufacturing plant should have

been deducted from the historic cost, and, in estimating the reproduction cost, the old plant being entirely useless, it would not be reproduced or included in the cost of such reproduction. In either event, in estimating the historic cost, less depreciation, and present reconstruction cost, less depreciation, the value of the obsolete plant would be omitted. The court pronounced such result unfair to the gas company and reversed a decision of the trial court based upon the master's report in which this exact thing was done. The court indicated its opinion that in some way the company should be compensated for the loss it suffered by scrapping an old plant and replacing it with a more modern and economical plant. It was suggested by the court that this might be done by a capitalization of the patent rights involved in the process which had been acquired by the company at an amount vastly greater than their cost. On this basis the gas company claimed about 100 times the cost. This, of course, was more or less of a makeshift, because in estimating the reproduction cost the cost of the acquisition of the patent could be and was properly included. The case was sent back to the trial court for redetermination of the question of value and depreciation in the light of the suggestions and decisions of the Supreme Court. In other words, the Supreme Court treated the question of depreciation allowance as one of fact to be determined in each case in the light of the entire situation as disclosed by the evidence to the end that a just allowance should be made for depreciation. The rule is the same as that for the determination of value as stated by then Associate Justice Hughes in the Minnesota Rate Case 1913, 230 U. S. 352, 434, 33 S. Ct. 729, 754, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18: "The ascertainment of that value [fair value] is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of all relevant facts." As we have construed the decision of the Supreme Court in the Pacific Gas & Elec. Co. v. City and County of San Francisco, supra, it decides that, in any estimate of the depreciation or obsolescent factors involved in rate-making, weight should be given to the historic cost as well as to the reproduction cost. In that particular case, of course, the device of stepping up the value of patent rights would accomplish the same purpose as the emphasis of historic cost as against reproduction cost. To elaborate further, suppose that the company in the case at bar, instead of purchas-

ing gas at the city limits from another corporation, had expended money for the building of pipe line from the gas wells to the city and claimed the benefit of this capital expenditure in the valuation of its property, but was met by the contention that, having incurred this expense and thus reduced the price of gas to the consumer, it had thereby rendered obsolete its manufacturing plant, we would have a situation almost exactly parallel to that involved in Pacific Gas & Elec. Co. v. City and County of San Francisco, supra, with the exception that no patent rights are involved, hence, the right of the company to an income upon the capital newly invested in the pipe line and also upon the manufacturing plant rendered obsolete by the introduction of natural gas, if at all, must be determined in some other way. If we understand the decision of the Supreme Court, it would require a consideration of what was just and fair under all the circumstances to deduct for depreciation due to the loss of value in the manufacturing plant. The solution adopted by the commission in the case at bar was to treat the manufacturing plant as a stand-by plant. It is the duty of the fact-finding body to take into consideration the historic cost as well as the reproduction cost in fixing value, and we believe that, in case of obsolescence due to the discovery of natural gas or new machinery for the making of gas, the court in determining the rate base should lean toward the historic cost rather than toward the reproduction cost, that is, should give some value to the displaced machinery or plant to the end that a going public utility may in the long run receive an adequate return upon its property.

In the light of this discussion the question is, What is reasonably to be done on the subject of depreciation in the case at bar? The company has accumulated as a depreciation reserve $9,350,689 in its gas department. This reserve, it is true, has been accumulated upon a sinking fund basis. It belongs to the company as much as any other property belongs to it. What could be more reasonable, however, in the case at bar, than to insist that the corporation apply its reserve for depletion to the actual physical depreciation of its plant, and also to the degree of obsolescence resulting from the discovery and use of natural gas. It would seem, under all the circumstances of the case, to be fair to the company to require that the money which had been paid to it for depreciation be considered as such in light of the fact that the manufacturing plant has so largely outlived

its usefulness. We recognize the fact that, if the manufacturing plant is used and useful for the purpose of furnishing gas to its consumers, the fact that it is not frequently used is not decisive of the question of obsolescence. The entire value of the manufacturing plant, if used and useful, depreciated by physical deterioration should be credited to the value of the plant. On the other hand, considered as a mere stand-by plant, it would be quite as reasonable to hold that the old plants of the company for the manufacture of gas from coal which may still be in existence should be incorporated in the rate base because of the belief that the oil resources of the country soon would be exhausted. No one, we think, would contend for the adoption of the theory of a stand-by plant with reference to the old plant for manufacturing gas from coal.

If in determining going concern value it is proper to consider the historic cost thereof, that is to say, to consider the extent to which current expenditures charged to the public have entered into the sum total of going concern value, as held by the Supreme Court in Des Moines Gas Co. v. City of Des Moines, 238 U. S. 153, 165, 35 S. Ct. 811, 59 L. Ed. 1244, supra, and if, as we hold, upon the authority of Natural Gas Co. v. Public Serv. Comm., 95 W. Va. 557, 121 S. E. 716, supra, it is proper in determining the value of the property to consider the historical subdivision of overhead cost and to apportion to the value of the property only that portion of the historical overhead which has in fact been treated as capital, it would seem to follow that in determining the depreciation we may consider the depreciation reserve as representing the historic cost or value of depreciation. That it should at least be prima facie regarded as the actual accrued depreciation is manifest for the reason that it represents the claim of the utility corporation conceded by the rate-regulating body to be the proper compensation to the utility for the depreciation of its property resulting from its use in the public service. The public having paid the accrued depreciation upon that claim authorized and fixed by the regulating body should not be required to again compensate for what was claimed to be annually accruing depreciation by shifting that depreciation forward to be again paid for, in the absence of clear proof, nor, on the other hand, to pay an income upon the reserve for depreciation which has been paid upon a claim for compensation for actual depreciation, unless by clear proof it is shown that the accumulated reserve is excessive. The New

282

York gas case (Board of Pub. Utility Com'rs v. N. Y. Tel. Co., 271 U. S. 23, 46 S. Ct. 363, 70 L. Ed. 808, supra) at first blush seems to be in direct conflict with this proposition, for it announces the principle that money collected by the company for accrued depreciation belongs to it, regardless of the fact that it is paid by the public upon a claim that it was necessary to compensate for accrued depreciation, when in fact a portion of it was not. Upon closer consideration, however, it is clear that the decision does not go that far. In that case there is an express finding of the public utility regulating body that the actual depreciation was less than the amounts which had been accumulated on the books of the corporation to compensate therefor by several million dollars ($4,750,000), and it was upon this finding that the regulating body required that some of this reserve not having been needed to compensate for past depreciation should be applied to future depreciation annuity. As the Supreme Court held this was a direct requirement that the corporation pay its own income from its own money—an obvious absurdity. This case is far from holding that it is either unreasonable or unjust to deduct the fund accrued for depreciation from the value of the property new to determine its depreciated value. We think it is prima facie correct to deduct this reserve. It may be conceded that the evidence may demonstrate that the reserve accumulated for depreciation is too great, and, where it is shown to be too great, the principle applied in the New York gas case and Pacific Gas & Elec. Co. v. City and County of San Francisco would require that only the actual depreciation should be deducted. The exact amount of the annuity based, as it must be, in part upon prophecy, is somewhat problematical, hence, it must be recognized that the annuity might be either too great or too small, but, having been arrived at by the best scientific knowledge available from time to time and having been charged to the consumers and paid by them, its weight in determining accrued depreciation ought not to be lightly disregarded. The depreciation reserve is $9,350,689; and we conclude that this is a reasonable allowance for accrued depreciation. This amount is greater than that fixed by the commission ($7,650,000). It is less than the straight line depreciation fixed by the commission engineers ($15,345,154). It is much more than the estimate of the company's engineer ($3,-470,326). Before passing this subject we will briefly consider these differences. If we add to the accrued depreciation allowance of

the commission the value of that portion of the gas manufacturing plant which the commission considered of doubtful value, we have $10,650,000 for accrued depreciation. The company's engineer fixed the actual accrued depreciation, based on as exhaustive an examination and inspection as was possible, in view of the fact that the pipe lines were underground and therefore inaccessible, at $3,-470,326. There is here a discrepancy of about $6,000,000 ($5,880,363) between the depreciation reserve which we have accepted as the reasonable amount of accrued depreciation and the estimate of the company's engineer, but the practical result of our conclusion is about the same as that which would be reached by accepting the estimate of the company's engineer for accrued depreciation and his corollary estimate for anticipated actual annual depreciation, instead of the amount allowed by the commission ($1,072,-000) therefor. The former affects the principal, or rate base, the latter affects the net income to the company. For, if we increase the rate base by the above difference of $5,-880,363, and also decrease the annual actual depreciation allowance by $589,531, the gross revenue reasonably needed to supply a reasonable net revenue will be $136,743 less than would be required on a rate base depreciated by $9,350,689 with annual depreciation allowance of $1,072,000. (The figure $589,531 is arrived at by deducting the amount of $482,469 from $1,072,000, and the item $482,-469 is derived from the testimony of the company's engineer as to actual annual depreciation, as we hereinafter more fully set forth).

Consequently, if we accept the commission's figures for depreciation annuity, as we are disposed to do, as will hereafter appear, the allowance for accrued depreciation of $9,350,689 works no injustice to the company in its net revenue on the estimates of its own engineers. We have used the rate of 7.7 per cent. for income, and the depreciation annuity at $1,072,000, in the foregoing computation, but will deal further with both items later in this opinion.

Depreciation Annuity.

Depreciation figured by the engineer of the commission, R. A. Wehe, based upon the report and observation of P. E. Dufour, valuation engineer for the commission, was arrived at on the straight line basis by assigning to certain portions of the plant their reasonable life expectancy, and deducting for each year's depreciation a percentage of the reproduction cost which that year bears to

the total life expectancy of the element under consideration. For illustration, the life fixed for the structures in the production plant is 33 years. The reproduction cost $1,450,353, the annual depreciation 3.0303 per cent., giving the annual depreciation for each year of the 33 years of the life of the structure of $43,950. The accrued depreciation would represent a similar amount deducted for each year of the past life of the structure. For this particular item the accrued depreciation would be $362,587. This would indicate that the structures were about 9 years old. Similarly, we have a life of 25 years assigned to the boiler plant equipment, 19.56 years for the production equipment, 40 years for the storage equipment, 20 years for miscellaneous production equipment, 20 years for by-product structure equipment, 35 years for structures in the distribution system, 20 years of distribution station equipment, 30 years for consumers meters and registers, 10 years for installation on consumers premises, and so on. The commission's engineer, Mr. Wehe, used as a rate base for estimating depreciation the reproduction cost new, plus 6 per cent. for overhead ($64,509,690), and for convenience we use his figures. He finds the depreciated rate base on the straight line basis as $48,797,227 and the accrued depreciation $15,712,463 (which is equal to $64,509,-690, minus $48,797,227). Upon the same basis (straight line) he finds the depreciation annuity $2,331,813. (These figures include special allowance for wrought iron pipe depreciation, which amounts to $56,706 per annum). This method of estimating the depreciation is in accord with the decision of the Supreme Court in United Railways & Electric Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 126, 74 L. Ed. 390: "The allowance for annual depreciation made by the Commission was based upon cost. The Court of Appeals held that this was erroneous and that it should have been based upon present value. The court's view of the matter was plainly right. One of the items of expense to be ascertained and deducted is the amount necessary to restore property worn out or impaired, so as continuously to maintain it as nearly as practicable at the same level of efficiency for the public service. The amount set aside periodically for this purpose is the so-called depreciation allowance. Manifestly, this allowance cannot be limited by the original cost, because, if values have advanced, the allowance is not sufficient to maintain the level of efficiency. The utility 'is entitled to see that from earnings the value of the property invested is kept unimpaired, so that, at the end of any given term of years, the original in-

vestment remains as it was at the beginning.' [City of] Knoxville v. Knoxville Water Co., 212 U. S. 1, 13–14, 29 S. Ct. 148, 152, 53 L. Ed. 371. This naturally calls for expenditures equal to the cost of the worn-out equipment at the time of replacement; and this, for all practical purposes, means present value. It is the settled rule of this court that the rate base is present value, and it would be wholly illogical to adopt a different rule for depreciation. As the Supreme Court of Michigan, in [Michigan Public] Utilities Commission v. Telephone Co., 228 Mich. 658, 666, 200 N. W. 749, 752, has aptly said: 'If the rate base is present fair value, then the depreciation base as to depreciable property is the same thing. There is no principle to sustain a holding that a utility may earn on the present fair value of its property devoted to public service, but that it must accept and the public must pay depreciation on book cost or investment cost regardless of present fair value. We repeat, the purpose of permitting a depreciation charge is to compensate the utility for property consumed in service, and the duty of the commission, guided by experience in rate making, is to spread this charge fairly over the years of the life of the property.' And see Southwestern Bell Tel. Co. v. Pub. Serv. Comm., 262 U. S. 276, 288, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Georgia Ry. & P. Co. v. R. R. Comm., 262 U. S. 625, 633, 43 S. Ct. 680, 67 L. Ed. 1144."

If we accept the estimate of the commission's engineer for annual depreciation of $2,331,813, on the straight line basis, it would seem to follow that we should also accept his estimate of accrued depreciation of $15,712,-463, and vice versa. As against this aspect of the case, we have the contention of the company, based upon the estimates of its engineers, that the total accrued depreciation reflected in the actual physical condition of the company's properties, ascertained by as careful an inspection thereof as was possible, is only $3,470,326. It is claimed by these engineers, however, that the balance of the depreciation reserve ($9,350,689 minus $3,470,-326), namely, $5,880,363, should be held in the reserve as a contingent reserve. His theory can perhaps best be indicated from some short excerpts from his testimony:

"Q. Applying your estimate, or rather, your inventory and valuation of accrued physical deterioration to the depreciation fund now on hand by the Company, would the balance remaining, in your opinion, be more or less or adequate as a contingency reserve? A. As on January 1, 1930, the Company had a balance in the depreciation re-

serve fund for the Gas Department of $9,-350,689.16. I have deducted for cost to restore or for accrued depreciation $3,470,326, which would leave $5,880,363 in the reserve as a contingency fund. In my opinion, that is not sufficient for a property of this size, operating under the conditions under which it is operating.

"Q. In the handling of a contingency reserve how is the interest on that reserve to be credited? A. That goes, of course, against surplus and is not charged to operating expenses.

"Q. The interest on the contingency fund, is that added to the fund itself? A. Yes, it is.

"Q. And in your opinion, as just expressed, the amount that would be left in the fund after the deduction of that estimate of accrued depreciation or deterioration would not be in excess of the amount reasonably required by this Company for a contingency reserve? A. That is correct. * * *

"Mr. Von Shrader: Mr. Luick, referring to your accrued depreciation in the sum of $3,470,326, you take that as depreciation adding up over the total life of the Company, do you not? A. That is the depreciation which existed as of January 1, 1930, yes.

"Q. And from what prior date? A. From the date of the earliest installation of any property which the Company had and which was still used and useful as of January 1, 1930.

"Q. Have you any opinion as to the first prior date that you could take in that connection? A. No. It would be a very rough one, probably around 1889. That is the earliest figure that I remember.

"Q. Well then, in figuring accrued depreciation you would not figure that as of one year but you would figure it as of a considerable number of years? A. No, I figured the accrued depreciation as I see the physical property at the time that I inspect it, regardless of how many years it took to accumulate that accrued depreciation.

"Q. But, as a matter of practice, in any operating company that depreciation is one of slow growth? A. It may or may not be one of slow growth. In this case apparently it was, because I think the physical properties of this Company are in very good condition.

"Q. Now, you have testified, as I understood you, that deducting that accrued depreciation from a depreciation reserve fund of the Company, that you had left in the depreciation reserve fund the sum of $5,880,363,

which you considered insufficient for that purpose? A. Yes.

"Q. Now, basing a depreciation reserve fund upon a slow depreciation of the Company's property, why should that be insufficient? A. Because there are numerous contingencies which may require that sum or sums in excess of that amount for, we will say, immediate use. We are faced constantly, for instance, with the necessity of replacing mains, taking them out of the ground and moving them away because of a change in street grades or widening of the streets. There is no possible way of determining in advance how much that is going to be. It depends entirely upon the rate at which the city grows and the direction in which it may grow. As to the physical conditions of that main, it may be just as good as the day that it went into the ground and yet it would require a contingency reserve to take care of such replacements.

"Q. I will ask you this: What is the general life of the mains of the Los Angeles Gas and Electric Corporation? Have you formed any opinion on that at all? A. I have no opinion on that.

"Q. Well, assuming that the life of the mains is 20 years, you don't mean to say that the Company would be faced with the expediency of buying new mains all in one year? A. Not the entire system, but any considerable portion of the system might be required, and the city does not ask the Company whether or not the main on a given street has been in the ground for 20 years before it decides to widen the street or to re-grade it. It is not a matter of the life or the age of the main in the ground at all.

"Q. You don't mean that the Company would be faced with the contingency of spending over $9,000,000 in any one year, do you? A. I think I said $5,000,000, and I don't mean to say it should all be spent in one year. It may be spent at any time in the existence of the Company, but it does need that much money as a safeguard. * * *

"Q. What I am referring to is I wanted you to explain in a little more detail your theory that the depreciation reserve fund of over $9,000,000, after the deduction of the accrued depreciation, is insufficient on the bases or in regard to the facts that there is slow depreciation, relatively slow depreciation, as you have stated? A. In the first place, the depreciation reserve fund, after the deduction of accrued depreciation, is $5,880,-000, as I remember the figure. So that your premise there was wrong, and at the same

time it does not change the conditions materially. The fact is that your depreciation reserve does not necessarily have any relation whatever to the accrued depreciation of the property. The property may be in perfect condition and yet may require replacement, as has happened time and time again in the history of this Company. The accruals must be made on some sort of uniform basis over the period of years so that the consumer who benefits by the use of the main pays his share toward the proper depreciation reserve which is necessary to replace the distribution system or the plant as replacements are required. The actual depreciation may be entirely a different thing. It may happen overnight. We could have a gas holder down here which is in perfect condition and yet if we should have an explosion that replacement could not have been foreseen and would have to be met immediately and we would have to have in the contingency fund a sufficient amount of money to make that replacement, and we would be entitled to have in such a fund such an amount.

"* * * you have figured there, or Mr. Hoff has figured for you, that the total cost to restore steel gas mains pursuant to table 4 is $860,267.40? A. That is correct.

"Q. And as I understand the method of computation there, it has not been based upon the age of the pipe but is based entirely upon the inspections and the computations made in the various tables? A. Yes, sir.

"Q. Now, will you explain in greater detail why the age of the pipe was not considered? A. Because, in my opinion, the age of the pipe has no bearing upon the accrued depreciation in the pipe. Cast iron main, for instance, is practically everlasting except under unusual conditions such as cases of electrolysis, to which I have previously referred. Steel mains, under proper conditions, would also have long lives, not as long perhaps as cast iron, but at the same time there is no reason why steel mains should deteriorate if the soil conditions are such that the deterioration is not set up. We have here in Los Angeles what is perhaps a rather unusual condition: We have, in the first place, your mountains here close to the shore, fairly close to the shore, with a decided and direct slope downward which tends to drain away any moisture almost as quickly as it falls to the ground. You have also the fact that your rains come intermittently, possibly only once a year with minor exceptions, and come at one time and after they are over with there is no further rain except a slight sprinkling on occasions. You have the next condition that in a city like Los Angeles, which is developed as it is, that most of the streets are paved with hard paving. Consequently, rain that falls rarely even gets into the ground, and, therefore, does not occasion oxidation in the mains. So all the way through you have unusually favorable conditions as to mains and as to oxidation or rusting away of mains, consequently, the age of the main itself has no bearing whatever on its actual physical condition."

Upon this theory about two-thirds of the reserve for depreciation is not necessary to take care of past depreciation, but was properly allowed to and set up by the company as a contingent reserve for future depreciation, which might occur from causes not ascertainable at the time the reserve was set up.

If we apply to his depreciation annuity of $1,300,000 the same proportion of actual to contingent depreciation (that is, $3,470,326 to $9,350,689), it would follow, as his opinion that about one-third of that amount ($1,300,000) would represent the actual depreciation accruing in the year 1931 and the balance would represent a contingent reserve, or, to be exact, the annual actual physical depreciation would be $482,430. In the light of these facts, the contention of the company's engineers that the accrued actual depreciation was $3,470,325, and that the actual physical depreciation of the property for the year 1931 would be $482,469, is reasonably consistent. The difficulty in determining the controversy arises from the fact that the commission's engineers, whether estimating the depreciation upon a sinking fund method, or upon a straight line method, assume a fixed actual physical depreciation annually, and estimate the loss due to such depreciation. The company's engineers, on the other hand, insist upon the principal of actually observed depreciation, both as a deduction for accrued depreciation and as a basis for determining the annual depreciation. We might agree that the methods of the company's engineers were the more logical, were it not for two facts. First, the question of depreciation must be based in a measure upon the broad experience of the engineering profession which represents the accumulated knowledge and wisdom of that profession. That judgment is exercised in assigning to each element of the plant such a length of life as engineers, guided by the experience and knowledge of their profession, assign thereto. It is upon this theory that the engineers of the commission have made their estimates. Second, the engineer for the company insisted upon a "contingent reserve" in addition to

the annuity for actual depreciation. It is true that this reserve is claimed upon the theory that contingencies may happen which cannot be reasonably anticipated, but we find no basis in the law for the allowance of such a reserve aside from those cases which hold that a company is entitled to accumulate some little surplus as a part of its financial set-up. Such a surplus has been and is being allowed to the company.

In view of this wide variation between the estimates of the commission's engineers on one hand and of the company's engineers on the other, the allowance by the commission of $1,072,000 is evidently not far amiss, for, if we deduct from the estimate of the commission's engineer for annual depreciation the same proportionate amount which we have deducted from his estimate of $15,345,-154, for accrued depreciation, we would have the amount of $1,420,908 as the depreciation annuity. This amount includes a depreciation annuity upon $10,917,727 gas manufacturing plant. On one item alone of gas manufacturing equipment (reproduction cost $9,-060,521, on 6 per cent. overhead basis), the depreciation annuity figured by the commission's engineer Wehe is $464,331. This deducted from the above amount ($1,420,908, minus $464,331) would give a depreciation annuity of somewhat less than $1,000,000, which is still more than twice the amount claimed by the company's engineer as the actual physical depreciation for 1931, as we have construed his testimony above. We do not wish to be understood, however, as holding that the company is entitled to no depreciation annuity upon the gas manufacturing plant, as we find it unnecessary to decide that question. Without further analysis of the evidence, we feel in any view that the depreciation annuity fixed by the railroad commission, $1,072,000, is sufficiently accurate as an estimate for depreciation to be deducted from the gross revenues in the determination of the question as to whether or not there has been a confiscation of the plaintiff's property. The evidence would justify a lower or higher annuity, but at best the amount is an estimate, and we think the finding of the commission under all the circumstances cannot be said to be unreasonable.

Gross Return, Expenditures, Net Income.

The commission estimated the 1930 return under the new rate schedule at $15,003,000, the total operating charge at $10,388,000, and the net return $4,615,000. The principal objection to the estimate of revenue and operating expense made by the company is that the estimate of the revenue is too optimistic. Two points are urged upon this proposition, namely, that the depression tends to reduce the consumption of gas and consequent revenue to the company, but the greatest emphasis is placed upon the effect of temperature upon the revenue of the company. It appears that gas is so largely displaced by electricity for lighting purposes that the main use of gas in Los Angeles is for heating and the amount so used depends upon the temperature. The commission's experts estimated the temperatures reasonably to be expected during the year 1931 and succeeding years by taking an average of the temperatures for 22 years. On the other hand, the company claims that the average of the preceding 5 years should be taken. The temperatures during the 5 years were much higher than the average for 22 years, and the resulting difference in estimated revenue to the company for the year 1930 is about $433,-000. So far as the year 1931 is concerned, we take judicial notice of the fact that the temperatures have been the lowest for many years and much lower than the average for 5 years. We think it too clear for argument that, in estimating a rate for a number of years in the future, an average for past years should be considered. This much is conceded, but it is equally true, we think, that the greater number of years considered in fixing the average the greater probability that the average thus fixed will reflect the average conditions in the future. It may be, when the present investigation under way by the Smithsonian Institute with reference to solar radiation has been completed, science may demonstrate that temperature changes are periodical and occur in regular cycles of say 11 years. In that event, of course, the average for the entire cycle would be the desirable one as a standard, but until such scientific demonstration the utilization of all available data by an average extending over a long period of time is the better practice. We therefore hold that there is nothing unreasonable in the estimate of returns by the commission so far as temperature is concerned, and there is nothing to indicate that due consideration was not given to the possible effect of the depression upon the consumption of gas.

Summary.

If we take the "historical reproduction cost" appraisal in the table hereinbefore set forth (from page 119) using historic cost overhead of 6.35 per cent., the appraisal of the company's engineers would give $59,082,-470 ($55,554,744, plus 6.35 per cent. thereof), the appraisal of the commission's en-

gineers, $58,367,949 ($54,882,886, plus 6.35 per cent. thereof), and the value fixed by the commission $58,258,061. The estimate of the company's engineers is only $824,409 more than that of the commission, and the difference between the estimates of the commission's engineers and the value fixed by the commission is only $109,888, or less than one-fifth of one per cent. If we take the finding of the commission as to historical reproduction cost as giving the historical cost using historical overhead (6.35 per cent.), and add to that $155,000 for interest during construction and $429,126 for organization and franchises giving $54,842,187, then add the commission's figures for materials and supplies, $450,000, and $645,000 for working cash capital, it gives us $59,937,187. To this amount the commission added one-half the estimate of additions and betterments for the year 1930, $767,103, but the company calls attention to the fact that the rates were fixed to begin on the 1st of January, 1931, and by that time the entire amount of that additions and betterments would have been added to the capital investment, and therefore they should have twice the sum allowed, that is, the whole amount involved ($1,534,206). This would add $1,534,206, giving $61,471,393 as the reasonable historical reproduction cost with historic overhead, plus the other elements of value above considered necessary to be included in the rate base, from which $9,350,689 is to be deducted in order to determine the depreciated historic cost. Deduct $9,350,689 from this base, and we have $52,120,704. The corresponding figures for the estimate of the company's engineers would be ascertained by adding the amount above stated as the basic difference between the estimates of the commission and of the company's engineers ($824,409) giving $52,945,113, and for the commission's engineers ($109,888) giving $52,230,592. We thus have:

Company's engineers' historic cost modified as above stated.......................... $52,945,113
Commission's engineers' .................... 52,230,592
Commission's findings modified by historic depreciation as above............... 52,120,704

One of the company's contentions is based upon the claim that working cash capital should include the deferred payments due it from the users of gas owing to the lag between the furnishing of the gas and the receipt of moneys therefrom. In other words, it wishes to include in its working cash capital its bills receivable and exclude its bills payable. We see no reason for this allowance. The working cash capital represents the amount of cash that the company is required to carry on hand to do business, and for that reason necessarily idle money. We think the allowance of $645,000 ample for this purpose, and have based the figures for a rate base on both historic and reproduction cost new on that basis. The foregoing figures represent as nearly as may be ascertained the modified historic cost, based in each instance upon the appraisal of 1915 approved by the commission in 1917, plus net cost of additions and betterments thereafter (1915–1929), plus increased value of land, plus other factors required to be found in the rate base, less depreciation.

The estimate of reproduction cost new by Engineer Luick for the company was $77,586,700 (not including going concern value), and that by Engineer Dufour for the commission using a 4-year average pricing period (1926–1929) was $73,637,542. These estimates include overhead costs at 24.27 per cent. and 22.32 per cent., respectively. We have hereinbefore stated that we think the historic overhead, that is, the overhead of 6.35 per cent. charged to capital on the books of the company, to be the proper allowance for this item in fixing the fair value of the company's property for rate-making purposes. The company's estimate of $77,586,700 modified to include only 6.35 per cent. overhead is $66,518,476 to which is to be added $450,000 for materials and supplies, $155,000 for interest during construction, $645,000 for working cash capital, and $1,534,206 for additions and betterments for 1930, giving a total reproduction cost new undepreciated of $69,302,682. From this total ($69,302,682) is to be deducted $9,350,689 for depreciation, as we have stated, being the amount of the reserve set aside by the company to take care of accrued depreciation, leaving $59,951,993, representing reproduction cost, less depreciation, excluding going concern value as estimated by the company's engineers. This same procedure with reference to the estimate by the commission's engineer gives a reproduction cost depreciated, excluding going concern value, of $57,894,983. Thus we have reproduction cost new depreciated modified as aforesaid, without going concern value:

Company's engineers ...................... $59,951,993
Commission's engineers .................... 57,894,983

If, for convenience, we take the estimate of the commission's engineer, we have cost of reproduction new $57,894,983, which does not include going concern value, while the historic cost of $52,945,113 does include many, but not all, of the elements of going concern value paid for by the company from

the current revenues derived from the consumers. As to this element of going concern value, we therefore lean toward the historic cost. Also, as we have stated, an element of going concern value is found in the rates fixed in so far as those rates give a profit to the common stockholder upon the cost of the bond and preferred stock money. If we take a rate base of $60,704,000 at 7.7 per cent. used by the commission, we have a leeway of $2,809,017 ($60,704,000, minus $57,894,983) in the rate base over depreciated cost of reproduction new to take care of the overhead charges, the promotion expenses, and the going concern value not otherwise allowed for in the valuation or rate. We think this is sufficient.

If we take as our fair value the $65,500,-000 fixed by the commission as a rate base at 7 per cent. we have $7,605,017 over depreciated cost of reproduction new as leeway to take care of going concern value, a greater amount of which must be reflected in the rate base in view of the decreased profit on bond and preferred stock money, and also to take care of overhead, promotion charges, and depreciation not otherwise included, if any.

The company insists that the evidence requires a finding that 8 per cent. is a reasonable rate of return upon the fair value of its property, but we cannot sustain this contention. The question of the percentage of return upon a public utility depends to a large extent upon the hazard as well as the current price of money which also varies with the hazard. We do not accept the testimony of financiers that 8 per cent. represents the rate of return upon "similar" enterprises, for the fact is that there are no similar enterprises except other gas companies and electric companies operating in California under the jurisdiction of the California railroad commission whose rates are fixed in the same manner as those of the plaintiff. The facts with relation to such investments are stated by the commission in its opinion and note thereto as follows:

"Under rates fixed on this basis utilities of this character have grown strong and prosperous. They have experienced no difficulty in securing capital for extensions and new development. Confidence in investments in such utilities has increased and capital has flowed to this field of investment readily and at a gradually decreasing rate or cost.[3]

[3] "In the published annual report of the Railroad Commission for 1918-9 it appears that at the close of the year 1918 the aggregate fixed capital of the gas and electric utilities of the State was $468,688,407.-07. Between 1918 and 1928 this increased rapidly, the total aggregate fixed capital mounting to a total of $1,185,372,478.71 by the close of 1928 (annual report for 1928-9). The aggregate par value of issued bonds and stock of gas and electric utilities, as taken from the annual reports of the Commission, was $543,285,594.04 in 1918 and $1,123,658,757.82 in 1928, an increase of $580,373,163.78. The increase includes $310,500,627.50 of bonds. An analysis of reports filed with the Commission shows that the remainder of $269,872,536.28 consists of $219,943,547.94 of preferred stock and $49,928,988.34 of common.

"The following tabulation shows the basis on which the Railroad Commission has authorized Southern California Edison Company and Pacific Gas and Electric Company to issue bonds and preferred stocks, being indicative not only of their growth but of the lessening cost of money:

### SOUTHERN CALIFORNIA EDISON CO.

| | Bonds | | | Preferred Stock | | |
|---|---|---|---|---|---|---|
| Year | Reference | Amount | Effective rate per cent. | Reference | Amount | Effective rate per cent. |
| 1919 | 16 CRC 423 | $ 8,000,000 | 6.58 | | | |
| 1920 | 18 CRC 164 | 5,000,000 | 7.54 | | | |
| 1921 | 20 CRC 294 | 6,000,000 | 7.80 | | | |
| 1922 | 22 CRC 417 | 5,160,000 | 5.75 | 22 CRC 45 | $ 9,500,000 | 7.00 |
| 1923 | 24 CRC 46 | 12,500,000 | 6.50 | 23 CRC 651 | 5,000,000 | 7.00 |
| 1924 | 24 CRC 594 | 14,000,000 | 6.45 | 25 CRC 579 | 10,000,000 | 6.86 |
| 1925 | | | | 27 CRC 130 | 10,000,000 | 6.25 |
| 1926 | Dec.16781 | 40,000,000 | 5.40 | 28 CRC 370 | 10,000,000 | 6.25 |
| 1927 | 30 CRC 355 | 30,000,000 | 5.20 | 30 CRC 754 | 10,000,000 | 5.85 |
| 1928 | | | | 31 CRC 439 | 10,000,000 | 5.61 |
| 1929 | 33 CRC 461 | 15,000,000 | 5.40 | 32 CRC 745 | 10,000,000 | 5.61 |
| 1930 | Dec.22121 | 5,000,000 | 5.18 | | | |

### PACIFIC GAS & ELECTRIC CO.

| | | | | | | |
|---|---|---|---|---|---|---|
| 1918 | 16 CRC 184 | 5,000,000 | 6.20 | 16 CRC 184 | 5,000,000 | 7.27 |
| 1919 | | | | 16 CRC 983 | 3,500,000 | 7.06 |
| 1920 | 19 CRC 140 | 10,000,000 | 7.63 | 19 CRC 7 | 5,000,000 | 7.50 |
| 1921 | 19 CRC 875 | 1,000,000 | 7.63 | 20 CRC 688 | 2,000,000 | 7.50 |
| 1922 | 21 CRC 128 | 10,000,000 | 6.40 | 22 CRC 166 | 5,000,000 | 6.86 |
| 1923 | 23 CRC 889 | 10,000,000 | 6.06 | 22 CRC 923 | 2,500,000 | 6.67 |
| 1924 | 25 CRC 307 | 12,500,000 | 5.90 | | | |
| 1925 | 26 CRC 531 | 10,000,000 | 5.87 | 27 CRC 335 | 2,500,000 | 6.32 |
| 1926 | 28 CRC 62 | 10,000,000 | 5.37 | 29 CRC 137 | 1,000,000 | 6.00 |
| 1927 | 30 CRC 377 | 15,000,000 | 4.90 | 29 CRC 276 | 5,000,000 | 6.12 |
| 1928 | 31 CRC 114 | 20,000,000 | 4.75 | 32 CRC 221 | 10,000,000 | 5.61 |
| 1930 | Dec. 22708 | 25,000,000 | 4.92 | Dec. 22488 | 10,000,000 | 5.61" |

"The Los Angeles Gas & Electric Corporation in respect to its gas operations has been before this Commission frequently since the time the Commission was given jurisdiction over its rates, sometimes on its application for authority to increase its rates, sometimes at the instance of the Commission or of complainants looking to reduction of rates. In all of these various proceedings rates were tested or measured by the standard stated above. Its rate base for its gas department has grown from approximately $12,500,000 in 1916 to nearly $59,000,000 in 1929, and its independent active meters from 131,500 to 351,000 during the same period.

"The growth in its gas department has been even exceeded by that in its electrical department, its rate base in that having increased from approximately $6,000,000 in 1916 to over $41,000,000 in 1929. The Company's total invested capital during the past fifteen years has increased to a sum more than five times the amount at the beginning of that period.

"This remarkable growth has been financed largely by the sale of the Company's bonds and preferred stock, these having been marketed at a gradually lessening cost, so that the present annual cost of its bond and preferred stock money is 6.17 per cent. Also, its depreciation reserve has been invested in the property. If this be included with its bond and preferred stock money at the rate of 6 per cent, being the rate at which it is required to account for its reserve, the annual cost of its bond, preferred stock and depreciation reserve money is but 6.14 per cent. On December 31, 1929, the Company had outstanding in the hands of the public $47,070,000 par value of bonds, $19,469,995 par value of preferred stock, and $20,000,000 par value of common stock. Its depreciation reserve on that date was reported at $16,804,105.15. All of its common stock is owned by Pacific Lighting Corporation. Since 1916 but $4,500,000 of this stock has been purchased for cash, $5,500,000, however, having been distributed to Pacific Lighting Corporation in the form of stock dividends, repre-

senting earnings left in the property. Dividends have been paid on its common stock of 7.20 per cent per share ($100 par value) in 1916, 1917 and 1918; 7.4 per cent in 1919; 8.4 per cent in 1920, 1921 and 1922; 8.7 per cent in 1923; 33.75 per cent in 1924; included in which is 25 per cent as a stock dividend of $2,500,000; 9 per cent in 1925; 9.815 per cent in 1926; 35.17 per cent in 1927, which includes a stock dividend of 21.42 per cent, or $3,000,000; 15 per cent in 1928, and 17 per cent in 1929. The Company's surplus has grown from $381,212.97 in 1916 to $4,176,663.09 in 1929, while its depreciation reserve increased from $3,804,383.36 to, as said above, $16,804,105.15."

We have a unique situation in California, for all such companies are under the jurisdiction of one rate-making body, the railroad commission. As these corporations have been successfully operated and financed for nearly 20 years under its supervision, and have extended their operations and increased their capital in conformity with the rulings of the state railroad commission, it would seem to follow that the income allowed by the railroad commission as return upon the money invested would be a better test of what constitutes a reasonable return than the off-hand testimony of financiers concerning the general cost of money for similar enterprises.

In view of our conclusion as to the ultimate result, we deem it unnecessary to go further than to say that a rate base of $60,704,000 with a return of 7.7 per cent. is not confiscatory, and that neither the base nor the rate is below the minimum allowable to furnish a return that is nonconfiscatory. The same is true of the rate base of $65,500,000 with a return of 7 per cent. thereon. I find myself in concurrence in the main with the reasoning and conclusions of Judge JAMES, and particularly in his conclusions as to the fair rate and rate base. I have, however, thought fit to express my views on going concern value, accrued depreciation, and depreciation annuity more at length, as I find the subject particularly difficult.

The injunction should be denied.